Kenneth N. Frucht, Esq.
Law Offices of Kenneth N. Frucht
120 Montgomery Street, Suite 1600
San Francisco, CA  94104
Tel:  415-392-4844
Fax:  415-392-7973

Attorney for Plaintiff
RONALD GREEN


DENNIS J. HERRERA, State Bar #139669
City Attorney
JOANNE HOEPER, State Bar #114961
Chief Trial Deputy
DONALD P. MARGOLIS, State Bar #116588
Deputy City Attorney
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California 94102-5408
Telephone:    (415) 554-3853
Facsimile:    (415) 554-3837
E-Mail:       don.margolis@sfgov.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO,
THOMAS ABRAHAMSEN, LORENZO ADAMSON,
DAVID OBERHOFFER, JERRY KING, and
MICHAEL WILLIAMS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD GREEN,<br><br>              Plaintiff,<br><br>     vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, THOMAS ABRAHAMSEN, LORENZO ADAMSON, DAVID OBERHOFFER, JERRY KING, MICHAEL WILLIAMS, RAMON BUNAG, ESTHER GRANIZO and Does 1-50, inclusive,<br><br>              Defendants. | Case No. C 07-3433 MMC<br><br>**PLAINTIFF AND MUNICIPAL DEFENDANTS' JOINT CASE MANAGEMENT STATEMENT**<br><br>Conf. Date:     December 7, 2007<br>Time:           10:30 a.m.<br>Place:          Crtrm 7, 19th Fl.<br><br>Trial Date:     None |

In response to this Court's Case Management Conference Order, the parties hereto submit the following Joint Case Management Statement.

1. **Jurisdiction and Service**

Plaintiff invokes federal question jurisdiction under 28 U.S.C. § 1331. He sues for damages under 42 U.S.C. § 1983, alleging violation of his civil rights. Defendants City and County of San Francisco, Thomas Abrahamsen, Lorenzo Adamson, David Oberhoffer, Jerry King, and Michael Williams ("the municipal defendants") do not contest personal jurisdiction or venue. Plaintiff represents that he has served all defendants. The municipal defendants have all appeared by answering the complaint.

Defendants Ramon Bunag and Esther Granizo were both served on October 23, 2007, but have not appeared.

2. **Facts**

Plaintiff alleges the following: In March 2005 Plaintiff rented a downstairs in-law unit and the garage from Esther Granizo. Plaintiff's unit had no kitchen, and Granizo allowed him use of the upstairs kitchen in the house. Plaintiff believes that Granizo and Ramon Bunag are co-owners of the house. Beginning in May 2005, Granizo and Bunag began to harass and intimidate Plaintiff in an attempt to get him to move out of his rental unit. Plaintiff, who was experiencing short-term cash-flow difficulties, had earlier worked out an arrangement with Granizo by which Plaintiff performed work on the house in exchange for Granizo accepting delayed rental payments. In June 2005, Defendant Officers Adamson and Abrahamsen came to Plaintiff's door and confronted him about his failure to pay rent. The officers told Plaintiff to pay his rent.

On July 1, 2005, Plaintiff was locked out of the upstairs unit, and therefore was unable to access the kitchen. Plaintiff called the police and Defendant Officers King and Williams responded. When the officers spoke to Granizo, she told them that Plaintiff had guns in his unit. Without further questioning, the officers handcuffed Plaintiff, entered his unit without permission, ransacked his home, and confiscated his gun collection. Plaintiff has had a gun collection for many years. There was no requirement that Plaintiff register his guns, and in California the only guns that must be registered are assault weapons, of which Plaintiff had none. There is similarly no requirement that guns in the possession of private individuals be unloaded. The City of San Francisco has attempted

on a number of occasions to enact ordinances requiring registration of of guns within city limits. These attempts have been unsuccessful.

On July 1, 2005, Plaintiff was arrested by Defendant Officers Adamson, Abrahamsen, and Oberhoffer based on false allegations by Defendant Bunag that Plaintiff was trespassing in the house. When Plaintiff asked why he was being arrested, Abrahamsen told him that he was being arrested for trespassing. The arresting officers subsequently prepared and submitted police reports containing materially false information. On July 29, 2005, Plaintiff was involuntarily placed in a psychiatric ward at San Francisco General Hospital and kept there for 72 hours.

Plaintiff was jailed for 85 days, after which his case was tried to a jury, and he was acquitted.

Plaintiff seeks damages for lost wages, emotional and psychological damages, punitive damages, and attorneys fees and costs.

<u>Defendants allege the following:</u>  At the relevant time, plaintiff rented an in-law unit from defendants Bunag and Granizo at 1 Santa Barbara Avenue, San Francisco. In July 2005, officers of the San Francisco Police Department had at least three contacts with plaintiff at that address, in response to calls for service. The circumstances of the calls – including the presence of several unregistered firearms and live ammunition in plaintiff's possession, reports that plaintiff had threatened his landlord with a rifle, and plaintiff's bizarre behavior, caused the responding officers to take action to protect against the risk of violence, including a shooting.

On July 1, 2005, defendant Officer King responded to a call from plaintiff regarding a landlord-tenant dispute. Plaintiff invited Officer King into his unit. Officer King observed a loaded rifle in plain view near the front door, and seized it for his own and plaintiff's safety. Plaintiff complained that his landlords were denying him kitchen access. He initially asserted he had joint ownership of the property. Plaintiff also disclosed to Officer King that plaintiff was carrying a 9-millimeter loaded pistol under his shirt, which Officer King naturally seized. (Officers are understandably trained to disarm civilians in their presence while conducting investigations, especially when those civilians are the targets of their investigations.) A fellow officer radioed plaintiff's identity and the identification numbers of the weapons to the dispatcher, and learned that

1. (1) there was an outstanding warrant for plaintiff's arrest; and (2) plaintiff was not the registered owner of the weapons. At that point, an officer handcuffed plaintiff.

An officer spoke with the landlord, defendant Esther Granizo. Granizo disclosed that she too had called dispatch that day to report that plaintiff had been banging on the door, and that she understood plaintiff may have guns. Officer King confirmed with headquarters by radio that indeed Granizo had called for service. Granizo, a 48 year-old woman slightly taller than 5 feet, advised Officer King that she was afraid of plaintiff, a 5'10" 34 year-old man. She reported that plaintiff had not threatened to kill or hurt her, but was constantly harassing her, and she felt intimidated by plaintiff's banging on her door and threats to damage her door. She also reported that plaintiff had turned her electricity off and made loud noises throughout the day, which she believed was out of a vindictive impulse to retaliate for her efforts to evict plaintiff.

Sergeant Williams arrived at the scene. Plaintiff acknowledged he had been banging on Granizo's door, claiming he had the right to enter to use the kitchen. He further acknowledged that, contrary to his initial representation, he was not a joint owner of the property. Officer King learned that the warrant had expired, after which he removed plaintiff's handcuffs. When asked if there were more weapons in the residence, plaintiff said "yes," and consented to a search of the residence for the weapons. The officers located at least four additional weapons. They checked the registration status of these weapons by radio. They learned none of the weapons was registered in plaintiff's name. On the advice of Sergeant Williams, Officer King confiscated the weapons for safekeeping. All told, he found and seized, among other things:

(1) a Jennings semi-automatic handgun loaded with 7 rounds of ammunition;

(2) a Makarov 9-millimeter caliber handgun, loaded with a magazine of 9 rounds of ammunition;

(3) a Colt .38 caliber pistol, loaded with 6 rounds of ammunition;

(4) a Colt .22 caliber pistol, loaded with 6 rounds of ammunition;

(5) a Marlin rifle, loaded with 7 rounds of ammunition; and

(6) an "Aqua Lung" 8-inch knife, with a 5 ½-inch blade.

The officers released plaintiff and issued him a receipt for the seized firearms and ammunition.

Two days later, on July 3, 2005, defendant Granizo phoned in a complaint of a disagreement with plaintiff. Defendant Officers Adamson and Abrahamsen responded. These officers worked out of the same station – Taraval – as Officer King and Sergeant Williams. They knew about their colleagues' experience two days earlier, because locating a cache of loaded unregistered weapons is a matter that triggers discussion among officers. The responding officers interviewed Granizo, who told them that she had come home earlier that day to find that the screws securing security bars on her rear windows were removed, and that she suspected plaintiff. The officers independently confirmed that the screws were indeed removed. Upon confrontation by the officers, plaintiff denied removing the screws. The officers took no further action other than documenting the complaint and their response. Plaintiff does not allege the occurrence of this event, and thus does not appear to consider this event to be actionable.

The key events occurred on July 28, 2005. Dispatch received a call for service from defendant Ramon Bunag and/or Clarita Calabia. Bunag was also a landlord, who apparently lived elsewhere; Calabia was another resident at the 1 Santa Barbara address. Defendant Officers Abrahamsen and Adamson responded to the call. These officers, of course, had relatively fresh in mind the call to which they had responded 25 days earlier, and the call to which their colleagues had responded 27 days earlier. They were specifically aware of the confiscation of several weapons on July 1. The officers located plaintiff not at his unit, but upstairs near the landlord's unit.

Plaintiff ranted bizarre things, prompting the officers' legitimate concern. He told the officers: (1) the house belonged to him, and that he had changed locks on it; (2) Bunag and Calabia were conspiring against him, and he needed to protect himself with a gun; (3) Bunag and Calabia were members of a gang or religious group; (4) unknown persons had poisoned his food (as he alleges in paragraph 18 or the complaint in this action); (5) he had taken possession of the premises "under the right of personal enjoyment," and he was in the process of taking title to the property; and (6) he had no paperwork (he admitted) substantiating his claim of ownership. Officer Abrahamsen, along with defendant Lieutenant David Oberhoffer, who arrived midway through plaintiff's rant, determined that plaintiff appeared to be paranoid and delusional.

After listening to plaintiff's bizarre harangue, Officer Abrahamsen asked plaintiff if he had any weapons, to which plaintiff answered that he had one in the garage. He consented to Officer Abrahamsen's entering the garage to search. The officer found a loaded rifle and seized it. He tested the lock on the rifle and discovered it did not function.

The civilian complainants corroborated the officers' impressions. Defendant Bunag told Officer Adamson that plaintiff had threatened to shoot Bunag that day with a rifle, and that plaintiff "was crazy." At that point, Officers Adamson and Abrahamsen arrested plaintiff. Plaintiff granted the officers permission to search his living unit. In the course of the consensual search, Lieutenant Oberhoffer found ammunition. The officers took plaintiff to the Taraval District Station, where he was booked and Mirandized.

Calabia and Bunag also went to the station to give written statements. At the station, Calabia told Officer Abrahamsen that she had moved out of her room a month earlier because plaintiff acted so erratically. She had returned home that day to retrieve belongings, and discovered the lock to the front gate had been changed. After she called Bunag, who let her into the house, she discovered many missing belongings, including diamond jewelry. She went outside to talk to Bunag, who had been speaking to plaintiff.

Bunag told Officer Abrahamsen (and wrote in his statement) that plaintiff had threatened Bunag as follows: "From now on, this is my house and you can't go in. Any move you make and you'll be out." Bunag said that plaintiff pointed his rifle directly at him while making his threat, causing Bunag to fear for his life. Bunag also said in his written statement that plaintiff bragged about having removed Calabia's belongings from the house and putting them outside.

In the course of the July 28 search, the officers located and confiscated one World War II era Bolt rifle, loaded with four rounds in the clip and one in the chamber, without an operable safety, as well as an impressive quantity of ammunition, as follows:

(1) 3 boxes of Remington .38 caliber Special ammunition;

(2) 1 box of Winchester .38 caliber Special Hollowpoint ammunition;

(3) 1 box of Remington of .22 caliber Cyclone ammunition;

(4) 1 box of Federal .357 magnum ammunition;

1     (5) 1 box of 3*D .38 caliber Special ammunition;

2     (6) 9 boxes of Remington .22 caliber LR ammunition

3     (7) 12 30/30 rounds of ammunition;

4     (8) 7 rifle rounds of ammunition;

5     (9) 5 .357 magnum rounds of ammunition;

6     (10) 10 .38 caliber Special rounds of ammunition;

7     (11) 1 pack of 30/30 rounds of ammunition;

8     (12) 1 holster containing .38 caliber Special rounds of ammunition; and

9     (13) 1 holster containing 9 millimeter caliber rounds of ammunition.

10 Plaintiff was booked for making terrorist threats, unlawful entry, forcible entry, possession of a drill with intent to vandalize, exhibiting a deadly weapon, and assault with a firearm. He was allegedly held in pre-trial detention approximately 85 days until his trial on October 21, 2005. Defendants currently understand he was tried on three counts: making a terrorist threat; exhibiting a deadly weapon, and assault with a firearm. He was found not guilty, and released.

Based on the decision of persons other than those who responded and booked him on July 28, shortly after his arrest that day plaintiff apparently was held for observation under California Welfare and Institutions Code section 5150 as a danger to himself or others.

    3. **Legal Issues**

The primary legal issues are whether: (1) the individual officer defendants enjoy qualified immunity; see *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727 (1982); (2) the individual defendants violated plaintiff's fourth amendment rights, or whether they had probable cause to search plaintiff's residence (assuming for argument's sake only that plaintiff did not consent to the searches); (3) the individual defendants violated plaintiff's constitutional rights by maliciously prosecuting him; and (4) the officers violated any constitutional rights pursuant to an official policy or custom, triggering municipal liability under *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018 (1978). P

    4. **Motions**

The individual officer defendants intend to move for summary judgment based on qualified immunity. The City will move for summary judgment for lack of evidence that there exists any official policy to violate the constitutional rights of parties to landlord-tenant disputes. If necessary, based on the evidence uncovered in discovery, the defendants may also move for summary judgment on the ground that no genuine issues of material fact exist, and the defendants are entitled to judgment as a matter of law. Defendants believe that as a matter of undisputed fact, they will establish, in addition, that plaintiff has no claim against them for malicious prosecution because the prosecution resulted from the independent exercise of prosecutorial discretion by the District Attorney, and the defendant officers made no false statements and did not conceal any exculpatory evidence.

5. **Amendment of Pleadings**

The U.S. Supreme Court recently took up a case in which it may decide whether the Second Amendment protects the right of an individual to possess a firearm. If the Court decides in the affirmative, Plaintiff would then move to amend to add a cause of action for violation of his Second Amendment constitutional rights.

The defendants do not currently intend to seek to amend their pleadings.

6. **Evidence Preservation**

Defendants have asked the relevant City departments to preserve evidence, and are attempting to gather all potentially relevant evidence. Plaintiff has maintained any evidence that he has relating to this matter.

7. **Disclosures**

There currently is no order in place setting the deadline for initial disclosures. (The defendants' declination to have the case assigned to a Magistrate Judge resulted in the reassignment of this case to Judge Chesney and the vacation of the initial case management order.) The parties propose an initial disclosure date of January 11, 2008.

8. **Discovery**

The parties have conducted no discovery to date. They seek leave to do so immediately upon completion of the case management conference. The parties anticipate serving document requests,

1  interrogatories, requests for admission, and taking depositions of the plaintiff, defendants, and
2  percipient witnesses. The parties address the subjects contained in Rule 26(f) as follows:
3      (a)   Changes to Initial Disclosure Requirements: The parties do not contemplate
4  any changes in the form or requirement for initial disclosures.
5      (b)   The parties anticipate discovery from percipient witnesses concerning the facts
6  of the incident that gives rise to this action. Expert discovery on proper police practices will also be
7  required.
8      (c)   The parties are unaware of any electronic discovery issues.
9      (d)   Defendants expect plaintiff to seek access to personnel files including records
10 of citizen complaints for unrelated incidents. Although defendants deny the discoverability of such
11 materials (see next paragraph), if the Court is inclined to allow such discovery, defendants propose
12 that the parties attempt to stipulate to the form of a protective order ensuring against inappropriate
13 handling or dissemination of these materials.
14     (e)   Defendants request a stay on any discovery relating solely to the issue of
15 municipal liability under *Monell*, until after the parties have completed discovery, and the court has
16 heard dispositive motions, on the issues of qualified immunity and presence or absence of any
17 constitutional violation. There can be no *Monell* liability without proof that an individual City
18 employee inflicted constitutional harm. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986);
19 *Quintanilla v. City of Downey*, 84 F.3d 353, 355-56. If the individual defendants establish on
20 summary judgment motion that they did not violate plaintiff's constitutional rights, plaintiff will have
21 no viable claim under *Monell*. Thus, to avoid distracting, time-consuming discovery on *Monell* issues
22 that ultimately could prove to be irrelevant and unnecessary – typically inquiries about incidents
23 unrelated to the subject incident – defendants request that the Court first allow the parties to complete
24 their discovery on individual liability, and hear dispositive motions as to those issues. Only if the
25 Court finds the potential for individual liability should it then allow discovery on *Monell* issues.
26     Plaintiff opposes bifurcation of discovery as it may lead to greater inconvenience and a
27 longer, drawn out litigation process. This is particularly so because Defendants have indicated their
28 intent to move for summary judgment based on the officer's purported qualified immunity. The

officer can conceivably commit constitutional violations and still be dismissed based on qualified immunity. However, a municipality has no qualified immunity, so even if the officers were to be dismissed on qualified immunity, the City could still be liable for the officers constitutional violations. "If the individual defendants successfully mount a defense of qualified immunity – essentially arguing that they committed constitutional violations in good faith – the city may still be liable. See <u>Ricciuti v. New York Transit Authority</u>, 796 F. Supp. 84, 86 (S.D.N.Y. 1992). Dismissing individual claims on the basis of qualified immunity would not obviate the need for a second trial because a dismissal on qualified immunity could occur even if there were constitutional violations. <u>Chew v. Gates</u>, 27 F.3d 1432 (9th Cir. 1994), <u>cert. denied</u> 513 U.S. 1148 (1995).

**9.     Class Actions**

Not applicable.

**10.    Related Cases**

None, to the parties' knowledge.

**11.    Relief**

Plaintiff seeks monetary damages.

**12.    Settlement and ADR**

There have been no ADR efforts to date. The parties have not discussed ADR. Defendants prefer to engage in initial discovery relevant to qualified immunity and whether a constitutional violation occurred, test these defenses on summary judgment, and engage in ADR efforts only if this approach does not resolve the case.

Plaintiff does not believe that ADR would be effective without litigating through summary judgment.

**13.    Consent to Magistrate for All Purposes**

Defendants have declined to consent to have a magistrate judge conduct further proceedings.

**14.    Other References**

The parties do not believe the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**15.    Narrowing of Issues**

1   As discussed above, defendants request bifurcation of discovery, postponing any *Monell*
2   discovery until a later phase.  Plaintiff opposes this request.  Should the matter proceed to trial,
3   defendants will also request bifurcation at trial, postponing any trial of *Monell* liability until after the
4   resolution of the issues of individual defendant liability.  Plaintiff will oppose bifurcation of trial.

   16.   **Expedited Schedule**

   The parties do not believe an expedited schedule is appropriate.

   17.   **Scheduling:**

   Defendants believe that discovery should be bifurcated, and therefore propose that the following proposed dates be set for the first phase of discovery.  Plaintiff believes that discovery should not be bifurcated, and therefore propose that the following dates be set for all purposes:

   **Lay witness depositions and written discov**ery:  September 28, 2008.

   **Expert designation:** October 26, 2008.

   **Hearing of dispositive motions:** November 16, 2008

   **Pretrial conference:**  To be discussed at conference.

   **Trial:**   To be discussed at conference.

   18.   **Trial**

   The parties request a trial by jury.  They expect the trial will last ten to 14 days.

   19.   **Disclosure of Non-party Interested Entities or Persons**

   Plaintiff and the individual defendants have filed Certifications of Interested Entities or Persons under Civil Local Rule 3-16.  Each such party hereby restates that as of this date, other than the named parties, there is no such interest to report.  By the terms of Rule 3-16, defendant City and County of San Francisco is exempt from the certification requirement.

   Dated:  November 30, 2007

                              LAW OFFICES OF KENNETH N. FRUCHT

                              By:_____/s/_____
                                 KENNETH N. FRUCHT
                                 Attorney for Plaintiff Ronald Green

Dated: November 30, 2007

          DENNIS J. HERRERA
          City Attorney
          JOANNE HOEPER
          Chief Trial Deputy
          DONALD P. MARGOLIS
          Deputy City Attorney

          By: _____/s/_____
          DONALD P. MARGOLIS
          Attorneys for Defendants