EXHIBIT A

TO DECLARATION OF
DONALD P. MARGOLIS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD GREEN,                    )
                                 )
              Plaintiff,          )
                                 )
     vs.                          )
                                 )        No. C07-3433 MMC
CITY AND COUNTY OF SAN            )
FRANCISCO, ET AL.,                )
                                 )
              Defendants.         )
_____

**CERTIFIED COPY**

DEPOSITION OF

RONALD GREEN

Tuesday, June 3, 2008

Volume I, Pages 1 - 262

Reported by:    Sharon Vartanian
                C.S.R. No. 10898

BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street
San Francisco, California 94104
(415) 982-4849

1   changed -- she locked me out of the kitchen, and I thought

2   that was like -- what the hell.  If I had known someone

3   else to call, I would have called them.  I called the

4   police.

5       Q.  Did the police officers respond when you called?

6       A.  They did.

7       Q.  What was the nature of your complaint to the

8   police?

9       A.  She locked me out of my kitchen.  Can you please

10  tell her to stop locking me out of the kitchen.

11      Q.  Who responded?

12      A.  Officers King and Williams.

13      Q.  Do you know what they look like?

14      A.  I do.  King is African American, to best of my

15  estimate six-foot-four, 225, 240 pounds.  And Sergeant

16  Williams, I believe he is five-foot -- five-foot-eight,

17  African American, a prominent scar on his head, and maybe

18  200 pounds, 185.

19      Q.  The officers came -- when they came did you see

20  them pull up?

21      A.  I did.

22      Q.  What did they do when they got out of their car?

23      A.  Officer -- this is on July 1st.  Officer King

24  entered through my door.

25      Q.  How did he enter?

217

1     A.  I opened it up.  I was hoping to have him do some

2  mediation with the landlord, just, you know, you can't

3  lock the guy out of his kitchen.

4     Q.  So you let him in?

5     A.  Of course.  I called him.  I needed help to get

6  her to, you know, not lock my kitchen.

7     Q.  What did Sergeant Williams do at the same time

8  that you allowed Officer King into your residence?

9     A.  Officer King was the first one there.  Officer

10  Williams was not yet on the scene.

11     Q.  Oh, they arrived in separate cars?

12     A.  They did.

13     Q.  Did Sergeant Williams at any point that day enter

14  your unit?

15     A.  He did.

16     Q.  Did you allow him in?

17     A.  Well, I mean, at that point they had me

18  handcuffed.  So it wasn't really an issue of allowing them

19  in.

20     Q.  Did they ask you -- well, let's back up.  When

21  did you get handcuffed?

22     A.  Well, Officer King went upstairs to talk to the

23  landlord, to my mind, to allow me access to my kitchen.

24     Q.  Let's back up a second.  Officer King is the

25  first to arrive.  He walks in.

218

1          What did you tell him?

2      A.  I said that, you know, my landlord is locking me

3  out of my kitchen.  Can you please let her know that, you

4  know, she can't lock me out of my kitchen.  I have a right

5  to use my kitchen.

6      Q.  Then what did he --

7      A.  The kitchen.  No problem.  He walked upstairs.

8      Q.  Which stairs did he take?

9      A.  The interior stairway.  Prior to going

10  upstairs --

11          MR. FRUCHT:  Take a break when you get a chance.

12          MR. MARGOLIS:  Okay.  Let's just finish this line

13  here.

14      Q.  So he goes up the interior stairs.  What does he

15  do when he gets to the top of the stairs?

16      A.  He knocked on her door and entered to speak with

17  her.

18      Q.  She allowed him in?

19      A.  I don't know.  I wasn't there.  I assume so, yes.

20      Q.  Well, did he announce himself to her?

21      A.  I don't know.  I wasn't there.

22      Q.  Were you listening?

23      A.  I was downstairs.  I was -- I didn't overhear

24  anything.  I think he identified himself as San Francisco

25  police prior to her opening up the door.

219

RONALD GREEN
06/03/2008

1    Q.  She would have had to have unlocked it to let him

2   in, right?

3    A.  To the best of my recollection, yes.

4    Q.  Did you overhear any portion of his conversation

5   with her?

6    A.  No.

7    Q.  Do you know anything about what she told Officer

8   King?

9    A.  No.

10    Q.  Then what happened?

11    A.  He returned -- well, actually, I followed him up

12   the stairs.  Got up to the top of the stairs, and he was

13   there.  And he asked me if I had a handgun?

14    Q.  What did you say?

15    A.  I said yes.

16    Q.  Then what happened?

17    A.  He took me downstairs.  I gave him my weapon.

18   And he called some other officers to respond.

19    Q.  Did you have a weapon on you at the time?

20    A.  I did.

21    Q.  Describe for me how it was on you.  Was it in a

22   holster?  Was it beneath your waistband?

23    A.  It was in my belt, in my back, in a waistband.

24    Q.  Was it in any kind of a holster?

25    A.  No.  Oh, yes.  It was in a black -- black

220

RONALD GREEN
06/03/2008

1  holster.

2       Q.  Was it loaded?

3            MR. FRUCHT:  I need to use the rest room.

4            MR. MARGOLIS:  Okay.  Go ahead.

5            VIDEOGRAPHER:  Going off the record.  The time is

6  4:03.

7                  (A short recess was taken.)

8            VIDEOGRAPHER:  Back on the record.  The time is

9  4:21.  Please continue.

10           MR. MARGOLIS:  Mr. Green, you were just talking,

11  before we broke, about having a gun in a black holster, I

12  believe.

13      A.  On my person, yes.

14      Q.  On your person, on July 1st, when Officer King

15  and Sergeant Williams responded.  And then I asked you was

16  the gun loaded.  And I didn't think I got an answer.

17      A.  There's really not much point in carrying an

18  unloaded gun.

19      Q.  So the answer is yes?

20      A.  Yes.

21      Q.  When had you placed the gun on your person that

22  day?

23      A.  I believe that morning.  I was in the habit of

24  wearing it at home because of the threats and intimidation

25  that I had received at that point.

                                                    221

1      Q.  For how long had you been receiving threats and

2   intimidation as of July 1st?

3      A.  Probably for sustained a month.

4      Q.  So for a period of somewhere around a month you

5   had a habit of keeping a loaded weapon on your person

6   while you were in your unit?

7      A.  Yes.

8      Q.  And you said that Officer King was the first to

9   arrive, you let him in, you talked to him, correct?

10     A.  Correct, yes.

11     Q.  And then he went upstairs through the interior

12  stairs and got in to see Ms. Granizo, correct?

13     A.  Yes, uh-huh.

14     Q.  You didn't hear -- you don't know exactly how he

15  got up into Ms. Granizo's area, correct?

16     A.  He -- I assume he went through the back door.

17     Q.  Okay.  And then you didn't hear the conversation

18  between him and Ms. Granizo, correct?

19     A.  I did not.

20     Q.  Then at some point did Officer King come back

21  down the same stairs that he had gone up to get back to

22  your unit?

23     A.  Yes, he did.  Actually, I followed him up the

24  backstairs.  I think he asked -- he called to me or

25  something.  And then I walked up the rear stairs to answer

222

RONALD GREEN
06/03/2008

1  stored kitchen utensils and just flatware and dishware,

2  other storage issues.  Tore off my bed sheets, threw them

3  out in the middle of the room, went through my desk.  Went

4  into my bathroom.  I think they looked in the toilet bowl.

5  I think they pulled off the cover of the toilet, looked in

6  there, from what I could hear.  I mean, just every nook

7  and cranny, they basically just ransacked the whole thing

8  while I was sitting there in handcuffs defending myself.

9      Q.  Did you say defending yourself?

10     A.  Well, I mean, stating clearly that I didn't have

11 a warrant.

12     Q.  Did they use any physical force on you other than

13 handcuffing you?

14     A.  No.

15     Q.  Did they confiscate your gun collection?

16     A.  Yes, they did.

17     Q.  You allege here your gun collection has never

18 been returned to you.

19         Do you see that?

20     A.  It has never been returned to me.

21     Q.  And you haven't filed the papers that they told

22 you you need to file to get them back, correct?

23     A.  I did not believe that those papers would have

24 been available to me without a burden that was -- I did

25 not feel comfortable retrieving them from the police

229

1  following my arrest.

2      Q.  So the answer is, yes, you have not filed the

3  papers necessary to try to retrieve them?

4      A.  I'm not sure what those papers are.

5      Q.  You were told by the police that there was a

6  procedure to retrieve the guns, correct?

7      A.  There was a procedure for me to go and get my own

8  personal property, yes.

9      Q.  And you haven't followed that procedure?

10     A.  I did not know what to -- I didn't follow up with

11 that procedure, no.

12     Q.  Did you have a loaded rifle that day near the

13 front door?

14     A.  Yes, I did.

15     Q.  Just leaning against the wall?

16     A.  It was near my desk in a corner.

17     Q.  Why?

18     A.  For personal defense.  I had been threatened.  My

19 life was basically being threatened constantly, sustained,

20 what I believe, threat.  They had used -- demonstrated

21 physical force against me.  And erring on the side of

22 caution, and some of the body language that he had used in

23 a threatening manner, indicated that if -- I mean, I'm

24 entitled to defend myself.

25     Q.  The physically threatening behavior, is that

                                                        230

1     I, SHARON VARTANIAN, CSR, hereby certify:

2     I am a duly qualified Certified Shorthand Reporter in

3  the State of California, holder of Certificate No. 10898

4  issued by the Court Reporters Board of California and

5  which is in full force and effect. (Fed R. Civ. P. 28(a)).

6     I am authorized to administer oaths or affirmations

7  pursuant to California Code of Civil Procedure, Section

8  2093(b), and prior to being examined, the deponent was

9  first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1)).

10     I am not a relative or employee or attorney or counsel

11  of any of the parties, nor am I a relative or employee of

12  such attorney or counsel, nor am I financially interested

13  in this action. (Fed. R. Civ. P. 28).

14     I am the deposition officer that stenographically

15  recorded the testimony in the foregoing deposition and the

16  foregoing transcript is a true record of the testimony

17  given by the deponent. (Fed R. Civ. P. 30(f)(1)).

18     Before completion of the deposition, review of the

19  transcript [  ] was [ X ] was not requested.  If

20  requested, any changes made by the deponent (and provided

21  to the reporter) during the period allowed, are appended

22  hereto. (Fed. R. Civ. P. 30(e)).

23     Dated:  June 18th, 2008.

24

25          _Sharon Vartanian_
Sharon Vartanian, CSR No. 10898

259

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD GREEN,                    )
                                 )
            Plaintiff,           )
                                 )
      vs.                        )
                                 )        No. C07-3433 MMC
CITY AND COUNTY OF SAN           )
FRANCISCO, ET AL.,               )
                                 )
            Defendants.          )
_____      )

DEPOSITION OF

RONALD GREEN

Monday, August 4, 2008

Volume II, Pages 263 - 395

Reported by:    Sharon Vartanian
                C.S.R. No. 10898

BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street
San Francisco, California 94104
(415) 982-4849

1    believe, primary basis for this lawsuit, the one on

2    July 28th of '05, resulting in your being arrested.

3            Do you recall telling the police officers on that

4    date that --

5        A.  I'm sorry.  You said "incident."  I'm not aware

6    of any incident other than drinking tea.

7        Q.  By "incident" I'm referring to a date, July 28th

8    of '05 --

9        A.  Okay.

10       Q.  -- when with the police responded to 1 Santa

11   Barbara Avenue.

12       A.  Yes.

13       Q.  Okay.  Do you recall police coming to that

14   address on July 28th of '05?

15       A.  I do.

16       Q.  How did you become aware?

17       A.  They knocked on my door.

18       Q.  And which door was that?

19       A.  That was the side entrance door downstairs.

20       Q.  Where were you?

21       A.  I believe I was in the garage area headed

22   upstairs at that time.

23       Q.  What were -- you were going upstairs for what

24   purpose?

25       A.  For maintenance, to begin painting.

                                                      283

1  the door?

2      A.  I believe I was at the bottom of the stairwell

3  from the downstairs to the upstairs.

4      Q.  All right.  So what did you do after you heard

5  the knock?

6      A.  I went upstairs and opened the door.

7      Q.  Well, you heard the knock on your downstairs

8  door, did you not?

9      A.  I did.

10     Q.  You went upstairs?

11     A.  Correct.

12     Q.  So did you go up to a different door from the one

13  that you heard being knocked on?

14     A.  Yes.

15     Q.  Why was that?

16     A.  I had seen a police cruiser approach through the

17  window as I was traveling back and forth, pull up across

18  the street, park in the ongoing lane of traffic by the

19  curb, and had seen Ramon Bunag outside, stationed maybe a

20  hundred yards from the front of the house to the right,

21  and just decided that was a good intermediary area to meet

22  them.

23     Q.  Let's back up.  You said about 100 yards to the

24  right.

25          You mean, if you're -- as you're facing the house

285

1      Q.  Is it conceivable to you that on July 28th, 2005
2  you used words like you had the right of personal
3  enjoyment of that property when speaking to the officers?
4      A.  I'm sorry.  Can you rephrase your question for
5  me?  Repeat it.
6      Q.  Yeah.  Focusing on July 28th, '05, is it
7  conceivable to you that that date you communicated to any
8  officer that you had the right of personal enjoyment of
9  the 1 Santa Barbara Avenue property?
10     A.  I believe that I made a statement to Lieutenant
11 Oberhouser regarding I had the right to personal enjoyment
12 and was not trespassing.  It was my residence.  It's a
13 single-family unit.  There's no separate address marking
14 the side entrance from the front entrance.  And that I
15 lived there.  I was not trespassing.  It was my residence.
16     Q.  Did you communicate to any officer on that day,
17 July 28th, that you were in the process of taking title to
18 the property?
19     A.  No.
20     Q.  Or that you were in the process of taking full
21 possession of the property?
22     A.  No.
23     Q.  Did you tell Officer Abrahamsen that day that you
24 had a weapon in your garage?
25     A.  I did.

294

1      Q.  How did that come up?

2      A.  He asked me if I had any weapons in the -- in the

3   house, and I told him that I did.

4      Q.  Did he ask you if he could enter to search for

5   the weapon?

6      A.  He did.

7      Q.  What did you say?

8      A.  I said yes.

9      Q.  Was this before or after being handcuffed?

10     A.  This was after being handcuffed.

11     Q.  In paragraph 26 of your complaint you state,

12  "After handcuffing plaintiff, the defendant officers

13  entered plaintiff's residence without a warrant and

14  without plaintiff's permission and confiscated a rifle

15  that belonged to plaintiff."

16         Is that a correct statement?

17     A.  That is a correct statement.

18     Q.  You told me a moment ago that you consented to

19  Officer Abrahamsen entering your garage.

20     A.  I was handcuffed.  I believed that I didn't have

21  any choice at that time.  I have since been informed that

22  I was under no obligation to give him the right to go in

23  and search my place.  In the interest of his safety and

24  any other tenant's safety to encountering a weapon

25  there -- I mean, I told him that for his safety and anyone

295

1       A.  It's my belief that they have been destroyed at

2   this point.

3       Q.  Let's assume they haven't been.

4       Have you decided not to actively seek retrieval

5   of those weapons?

6       A.  If they are still available to me, I would -- I

7   might go back and get them.  But I would have to consult

8   with my attorney prior to making that arrangement.

9       Q.  And what is -- on what do you base your belief

10  that they have been destroyed?

11      A.  I was told that they would be kept for a period

12  of two years and then destroyed.

13      Q.  And during the two-year period that you were told

14  they would be kept, did you try to retrieve them?

15      A.  I have not yet attempted to retrieve them, no.  I

16  have not yet, no.

17      Q.  You were told that the two-year period would be

18  from when to when?

19      A.  From the date of confiscation --

20      Q.  In '05, right?

21      A.  In '05, yes.

22      Q.  So in the two-year period from July 28, 2005

23  until July 27, 2007, did you attempt to retrieve your

24  firearms?

25      A.  I believe that they were seized prior to

387

RONALD GREEN
08/04/2008

1   July 28th.

2       Q.  You're right.

3       A.  And there was another seizure on the 28th.

4       Q.  Some were seized almost a month before that,

5   right?

6       A.  Correct.  July 5th, I believe.

7       Q.  Okay.  Let's say it's July 5th, or early July.

8       In the two-year period from early July of '05

9   until July of '07, did you attempt to retrieve any of the

10  firearms that were confiscated?

11      A.  No.

12      Q.  Just give me a moment.

13      Are you currently actively seeking employment?

14      A.  I am.

15      Q.  What kind of employment are you seeking?

16      A.  Different sorts.  I'm actually construction --

17  seeking training for -- well, I have a training program

18  coming up for a construction and administration

19  certificate.  So if I find another job that pays more, I

20  would accept that, doing anything, anything that pays.

21      Q.  Again, you think that all of these efforts to get

22  employment in the construction field have been harmed,

23  have been adversely impacted by your -- by the

24  San Francisco Police Department?

25      A.  It has certainly harmed my personal

1    I, SHARON VARTANIAN, CSR, hereby certify:

2    I am a duly qualified Certified Shorthand Reporter in

3    the State of California, holder of Certificate No. 10898

4    issued by the Court Reporters Board of California and

5    which is in full force and effect. (Fed R. Civ. P. 28(a)).

6    I am authorized to administer oaths or affirmations

7    pursuant to California Code of Civil Procedure, Section

8    2093(b), and prior to being examined, the deponent was

9    first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1)).

10    I am not a relative or employee or attorney or counsel

11    of any of the parties, nor am I a relative or employee of

12    such attorney or counsel, nor am I financially interested

13    in this action. (Fed. R. Civ. P. 28).

14    I am the deposition officer that stenographically

15    recorded the testimony in the foregoing deposition and the

16    foregoing transcript is a true record of the testimony

17    given by the deponent. (Fed R. Civ. P. 30(f)(1)).

18    Before completion of the deposition, review of the

19    transcript [  ] was [ X ] was not requested.  If

20    requested, any changes made by the deponent (and provided

21    to the reporter) during the period allowed, are appended

22    hereto. (Fed. R. Civ. P. 30(e)).

23    Dated:  August 7, 2008.

24

25    _Sharon Vartanian_
     _____
     Sharon Vartanian, CSR No. 10898

392

RONALD GREEN
08/04/2008

EXHIBIT B

TO DECLARATION OF
DONALD P. MARGOLIS

1    Kenneth N. Frucht, State Bar No. 178881
     LAW OFFICES OF KENNETH FRUCHT
2    120 Montgomery Street, Suite 1600
     San Francisco, CA 94104
3    Tel: (415) 392-4844
     Fax: (415) 392-7973
4

5    ATTORNEY FOR PLAINTIFFS

6

7                        UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   RONALD GREEN,                    )    CASE NO.:
                                      )
11              Plaintiff,            )
                                      )
12        v.                          )
                                      )
13   CITY AND COUNTY OF SAN           )    COMPLAINT FOR DAMAGES
     FRANCISCO, THOMAS ABRAHAMSEN,    )    (42 U.S.C 1983)
14   LORENZO ADAMSON, DAVID           )
     OBERHOFFER, JERRY KING, MICHAEL  )
15   WILLIAMS, RAMON BUNAG, ESTHER    )
     GRANIZO, and DOES 1-50, inclusive, )
16                                    )
                Defendants.           )
17   _____)

18        COMES NOW PLAINTIFF Ronald Green ("GREEN") and alleges and complains against

19   Defendants, CITY AND COUNTY OF SAN FRANCISCO, Thomas Abrahamsen, Lorenzo

20   Adamson, David Oberhoffer, Jerry King, Michael Williams, Ramon Bunag and Esther Granizo, and

21   DOES 1-25, inclusive, as follows:

22                        I.    JURISDICTION

23        1.    This is a civil rights action and this Court has original jurisdiction pursuant to 28

24   U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.  The Court has supplemental jurisdiction over

25   Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26        2.    Venue is proper in the Northern District of California under 28 U.S.C. 1391(b)

27   because a substantial part of the events or omissions giving rise to the claims in this action occurred

28   within this District.

                                      -1-

COMPLAINT

## II.    PARTIES

3.    At all times relevant hereto, GREEN was a resident of the City and County of San Francisco, State of California.

4.    Defendant, CITY AND COUNTY OF SAN FRANCISCO ("CCSF"), is and was at all times herein mentioned, a public entity duly organized and existing under the law of the State of California.

5.    Defendant Thomas Abrahamsen ("ABRAHAMSEN") was at all times herein mentioned a police officer of the San Francisco Police Department. In that capacity he was acting under color of state law during the relevant acts and omissions alleged herein. He is being sued herein in his individual capacity.

6.    Defendant Lorenzo Adamson ("ADAMSON"), was at all times herein mentioned a police officer of the San Francisco Police Department. In that capacity he was acting under color of state law during the relevant acts and omissions alleged herein. He is being sued herein in his individual capacity.

7.    Defendant David Oberhoffer ("OBERHOFFER"), was at all times herein mentioned a police officer of the San Francisco Police Department. In that capacity he was acting under color of state law during the relevant acts and omissions alleged herein. He is being sued herein in his individual capacity.

8.    Defendant Jerry King ("KING"), was at all times herein mentioned a police officer of the San Francisco Police Department. In that capacity he was acting under color of state law during the relevant acts and omissions alleged herein. He is being sued herein in his individual capacity.

9.    Defendant Michael Williams ("WILLIAMS"), was at all times herein mentioned a police officer of the San Francisco Police Department. In that capacity he was acting under color of state law during the relevant acts and omissions alleged herein. He is being sued herein in his individual capacity.

10.    Defendant Ramon Bunag ("BUNAG") is an individual and Plaintiff is informed and believes that he was at all times mentioned herein a resident of the City and County of San

-2-

Francisco. Plaintiff is informed and believes and thereupon alleges that at all times mentioned

herein, BUNAG conspired with the defendant police officers and participated in joint action with

defendant police officers with the intent to deprive Plaintiff of his constitutional rights. Therefore,

at all times mentioned herein, BUNAG acted under color of state law.

11.     Defendant Esther Granizo ("GRANIZO") is an individual and Plaintiff is informed

and believes that he was at all times mentioned herein a resident of the City and County of San

Francisco. Plaintiff is informed and believes and thereupon alleges that at all times mentioned

herein, Granizo conspired with the defendant police officers and participated in joint action with

defendant police officers with the intent to deprive Plaintiff of his constitutional rights. Therefore,

at all times mentioned herein, Granizo acted under color of state law.

12.     Plaintiff is ignorant of the true names and capacities whether. individual, corporate

or otherwise, of DOES 1-25 herein and prays leave of the Court to insert the true names and

capacities of such Defendants when they become known or are ascertained, together with

appropriate charging allegations.

13.     Plaintiff is informed and believes and thereon alleges that each of the Defendants

named herein was the agent, employee or representative of each of the other defendants, and in

doing the things herein mentioned, were acting in the course and scope of such agency and/or

employment. It is further alleged that each of the Defendants, in doing the acts or omissions

complained of herein, acted or omitted to act in concert as agents of and/or on behalf of the other

defendants named herein, and authorized, ratified, and aided and abetted the doing of the acts

alleged herein, and proximately caused Plaintiff's damages as herein alleged while acting in such

capacity.

## III.    FACTUAL ALLEGATIONS

14.     Plaintiff is informed and believes and thereupon alleges that in 2005, the property at

1 Santa Barbara Street in San Francisco, California (the "HOUSE"), was owned jointly by

GRANIZO and BUNAG.

15.     In March 2005 Plaintiff rented a downstairs in-law unit at the HOUSE from

GRANIZO. Plaintiff lived in the in-law unit, and also rented the garage. Plaintiff is a collector of

COMPLAINT

1   guns, and kept a gun collection in his home that he had built up over many years.

2       16.     Plaintiff's unit did not have a kitchen, and therefore, pursuant to the rental

3   agreement, Plaintiff was given permission to use the kitchen in the upstairs unit.

4       17.     In or about May 2005, Plaintiff was experiencing financial difficulties. GRANIZO

5   and Plaintiff reached an agreement whereby Plaintiff performed work on the house in exchange for

6   a deferment of the rental payments that he owed. In accordance with this agreement, and as

7   consideration for the rent deferral, Plaintiff performed yard work, painted parts of the HOUSE, and

8   made repairs and/or replacements to various parts of the HOUSE.

9       18.     Despite the rent deferral agreement between GRANIZO and Plaintiff, beginning in

10  May 2005, defendant BUNAG and GRANIZO began to harass Plaintiff in an attempt to intimidate

11  him and cause him emotional distress, and thereby force him to vacate the rental unit. On one

12  occasion BUNAG brought several scary looking individuals to the house and threatened Plaintiff

13  with harm if he did not move out. At another time a death threat was made on Plaintiff. Plaintiff

14  was repeatedly told by BUNAG and associates of BUNAG that he would be harmed. On other

15  occasions, professional tools from Plaintiff's workshop in the garage disappeared. Yet on other

16  occasions, Plaintiff's food items were tampered with and contaminated by the placement of foreign

17  substances in the food. Finally, BUNAG and GRANIZO cancelled Plaintiff's water and PG&E

18  service at the HOUSE.

19      19.     The aforementioned conduct by BUNAG and GRANIZO were intended to cause

20  Plaintiff emotional distress, and did cause him severe emotional distress, including but not limited

21  to fear, anxiety, anger, and stress.

22      20.     In or about June 2005, San Francisco Police Officers ADAMSON and

23  ABRAHAMSEN went to the HOUSE and confronted Plaintiff about his failure to pay rent. The

24  officers asked Plaintiff why he had not paid his rent and told him to pay the rent. Plaintiff is

25  informed and believes and thereupon alleges that ADAMSON and ABRAHAMSEN confronted

26  Plaintiff about his nonpayment of rent, and became involved in what was essentially a landlord

27  tenant issue, at the request and urging of BUNAG and GRANIZO.

28      21.     On or about July 1, 2005, GRANIZO changed the lock to the upstairs unit and

-4-

1  refused to allow Plaintiff access to the kitchen. When Plaintiff called the police, Officers KING

2  and WILLIAMS responded. When the officers spoke to GRANIZO, she indicated to them that

3  Plaintiff had guns in his unit. Without any questioning, the officers immediately placed Plaintiff in

4  handcuffs and unlawfully entered his unit without a warrant and without Plaintiff's consent. Upon

5  entering Plaintiff's unit, the officers ransacked his home and confiscated his gun collection.

6  Plaintiff remained in handcuffs for approximately one hour before he was released. Plaintiff's gun

7  collection has never been returned to Plaintiff.

8        22.    Plaintiff is informed and believes that or about mid-July, an individual came and

9  made an appraisal of the value of Plaintiff's truck and tools that were stored in the garage – at the

10  behest of BUNAG and GRANIZO. Plaintiff is further informed and believes and thereupon alleges

11  that BUNAG and GRANIZO wanted to know the value of Plaintiff's possessions, because they

12  intended to have Plaintiff arrested and jailed, and thereafter to convert his truck and tools.

13        23.    On or about July 28, 2005, ADAMSON, ABRAHAMSEN, and OBERHOFFER

14  came to the HOUSE in response to a call from BUNAG falsely alleging that Plaintiff was

15  trespassing at the HOUSE.

16        24.    Plaintiff is informed and believes and thereupon alleges that when they arrived at the

17  HOUSE on or about July 28, 2005, defendant police officers knew or reasonably should have

18  known that Plaintiff's agreement as a tenant allowed him access to the upstairs unit for the purpose

19  of using the kitchen, that BUNAG had previously and unsuccessfully attempted to evict Plaintiff

20  from the HOUSE, that BUNAG had a grudge against Plaintiff as well as a dispute about Plaintiff's

21  rental of the HOUSE, and that BUNAG and GRANIZO were using the officers in his effort to

22  remove Plaintiff from the premises.

23        25.    When the officers arrived at the HOUSE on July 28, 2005, they immediately placed

24  Plaintiff in handcuffs. When Plaintiff asked why he was being arrested, ABRAHMSEN told him

25  that he was being arrested for trespassing.

26        26.    After handcuffing Plaintiff, the defendant officers entered Plaintiff's residence

27  without a warrant and without Plaintiff's permission, and confiscated a rifle that belonged to

28  Plaintiff. The officers then took Plaintiff to jail.

-5-

COMPLAINT

27.    On or about July 29, 2005, defendants caused Plaintiff to be involuntarily placed in the San Francisco General Hospital Psychiatric Ward where he was kept for 72 hours.

28.    After Plaintiff was arrested, defendants submitted police reports containing false statements and material omissions, the result of which was to interfere with the independent judgment of prosecuting attorneys and cause Plaintiff to be criminally prosecuted.

29.    As a result of the conduct of the defendants, and each of them, Plaintiff was jailed for 85 days in the San Francisco County Jail. His case was then tried before a jury and he was acquitted of all charges.

30.    During that time that Plaintiff was jailed and awaiting trial, BUNAG and GRANIZO caused or allowed Plaintiff's truck and motorcycle and other possessions to be damaged or taken.

31.    Plaintiff is informed and believes and thereupon allege that BUNAG and GRANIZO's statements to dispatchers and to San Francisco police officers were intentionally and maliciously false and were meant to cause the police to arrest, charge, and convict Plaintiff and achieve BUNAG's and GRANIZO's goal of permanently removing Plaintiff from his home. BUNAG's and GRANIZO's actions and conduct were deliberate, reckless, malicious, and undertaken with deliberate indifference and conscious disregard for Plaintiff's rights.

## DAMAGES

32.    As a direct and proximate result of the acts and omissions of the Defendants as alleged herein, Plaintiff was deprived of his constitutional rights and of his liberty and freedom.

33.    As a further direct and proximate result of the acts and omissions of the Defendants as alleged herein, Plaintiff was unable to work for the period of his incarceration, and suffered a loss of income as a result.

34.    As a further direct and proximate result of the acts and omissions of the Defendants as alleged herein, Plaintiff suffered and continues to suffer humiliation, fear, embarrassment, emotional anguish and extreme emotional distress in an amount to be determined according to proof at trial.

35.    Defendants acts and omissions were willful, oppressive, fraudulent and malicious, and as a result of such conduct Plaintiff is entitled to, and seeks punitive damages from each of the

-6-

COMPLAINT

individual defendants.

## FIRST CLAIM

(42 U.S.C. § 1983 – Violation of Plaintiff's Fourth Amendment Rights -
Against CCSF, WILLIAMS, KING, BUNAG, GRANIZO, and Does 1 through 50)

36.     Plaintiff realleges and incorporates by reference all of the allegations contained in paragraphs 1 through 35 above.

37.     The acts and omissions of the defendants as described herein leading up to occurring on or about July 1, 2005, violated Plaintiff's rights under the laws and Constitution of the United States including but not limited to his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution.

38.     As a proximate result the conduct of the defendants, Plaintiff was damaged in an amount to be determined by proof at trial.

39.     Defendants engaged in the aforementioned acts maliciously, callously, oppressively, wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated, despicably and with evil motive and/or intent, and in disregard of the rights of Plaintiffs. Plaintiffs are therefore entitled to and do seek punitive damages against.

WHEREFORE plaintiff seeks relief in an amount according to proof at trial.

## SECOND CLAIM

(42 U.S.C. § 1983 – Violation of Plaintiffs' Fourth Amendment Rights -
Against CCSF, ADAMSON, ABRAHAMSEN, OBERHOFFER, BUNAG, GRANIZO, and Does 1
through 50)

40.     Plaintiff realleges and incorporates by reference all of the allegations contained in paragraphs 1 through 39 above.

41.     The acts and omissions of the defendants as described herein and which culminated in Plaintiffs' arrest on July 28, 2005, Plaintiff's incarceration in the San Francisco County Jail, and Plaintiff's involuntary confinement in the San Francisco General Hospital Psychiatric Ward, violated Plaintiff's rights under the laws and Constitution of the United States including but not limited to his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution.

42.     As a proximate result the conduct of the defendants, Plaintiff was damaged in an

COMPLAINT

1   amount to be determined by proof at trial.

2       43.   Defendants engaged in the aforementioned acts maliciously, callously, oppressively,

3   wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated,

4   despicably and with evil motive and/or intent, and in disregard of the rights of Plaintiffs. Plaintiffs

5   are therefore entitled to and do seek punitive damages against.

6                          **THIRD CLAIM**
                 (42 U.S.C. § 1983 - Violation of Plaintiffs' Fourteenth Amendment Rights -
7   Against CCSF, ADAMSON, ABRAHAMSEN, OBERHOFFER, BUNAG, GRANIZO, and Does 1
8                              through 50)

9       44.   Plaintiff realleges and incorporates by reference all of the allegations contained in

10  paragraphs 1 through 43 above.

11      45.   The acts and omissions of the defendants as described herein culminated in the

12  malicious prosecution of Plaintiff. Plaintiff was subsequently acquitted of all charges.

13      46.   As a proximate result the conduct of the defendants, Plaintiff was damaged in an

14  amount to be determined by proof at trial.

15      47.   Defendants engaged in the aforementioned acts maliciously, callously, oppressively,

16  wantonly, recklessly, fraudulently, with deliberate indifference to the rights allegedly violated,

17  despicably and with evil motive and/or intent, and in disregard of the rights of Plaintiffs. Plaintiffs

18  are therefore entitled to and do seek punitive damages against.

19      WHEREFORE plaintiff seeks relief in an amount according to proof at trial.

20                          **FOURTH CLAIM**
                              (Conspiracy -
21  Against CCSF, ADAMSON, ABRAHAMSEN, OBERHOFFER, WILLIAMS, KING, BUNAG,
22                     GRANIZO, and Does 1 through 50)

23      48.   Plaintiff realleges and incorporates by reference all of the allegations contained in

24  paragraphs 1 through 47 above.

25      49.   Plaintiff is informed and believes and thereupon alleges that between May and July

26  of 2005, defendant police officers and BUNAG and GRANIZO agreed to implicate, arrest, and

27  cause the conviction of Plaintiff on false criminal charges.

28      50.   Pursuant to and in furtherance of defendants' conspiracy, Defendants fabricated false

    and misleading evidence, presented perjured testimony withheld or concealed exculpatory evidence,

                                    -8-

1    and acted in other ways as set forth in this complaint.

2         51.    As a proximate result of the conspiracy of the defendants, Plaintiff was falsely

3    arrested and imprisoned for 85 days and deprived of his liberty and freedom.

4         52.    The conduct of the defendants was willful, oppressive, fraudulent and malicious,

5    thereby entitling Plaintiff to punitive damages from the individual defendants

                                    **FIFTH CLAIM**
6                        (Intentional Infliction of Emotional Distress –
7                               Against All Defendants

8         53.    Plaintiff realleges and incorporates by reference all of the allegations contained in

9    paragraphs 1 through 52 above.

10        54.    The conduct of Defendants, and each of them, as set forth above was extreme and

11   outrageous.  Said conduct was intended to cause severe emotional distress to Plaintiff.  Defendants,

12   by causing the false arrest and imprisonment of Plaintiff, and by making knowingly false and

13   baseless accusations and other statements enumerated above against Plaintiff, conducted themselves

14   in a manner that went beyond all commons notions of decency.  Defendants, and each of them,

15   engaged in conduct intended to humiliate, embarrass, and instill fear in Plaintiff.  Defendants,

16   through their actions and the actions of their agents, directly injured Plaintiff by their failure to act

17   in accordance with common notions of fairness and decency.

18        55.    The foregoing conduct did in fact cause Plaintiff to suffer extreme emotional

19   distress.  As a proximate result of said conduct, Plaintiff suffered embarrassment, anxiety,

20   humiliation and emotional distress, and will continue to suffer said emotional distress in the future

21   in an amount according to proof at trial.  Defendants' conduct was the proximate cause of harm and

22   damage to Plaintiff, and by reason of the foregoing alleged acts and conduct Plaintiff is entitled to

23   and seeks general and punitive damages all according to proof at trial

                                    **ELEVENTH CLAIM**
24                                  (Monell Claim –
25                                  Against CCSF)

26        56.    Plaintiff realleges and incorporates by reference all of the allegations contained in

27   paragraphs 1 through 55 above.

28        57.    Plaintiff is informed and believes and thereupon allege that he suffered the violation

                                          –9–

of his constitutional rights as a result of customs, policies, patterns and/or practices of Defendant City and County of San Francisco, including but not limited to deliberate indifference in the hiring, supervision, training, and discipline of members of the SFPD, including, but not limited to the Defendants named in this Complaint and DOES 1-50.

58. Plaintiff is informed and believes and thereupon allege that he suffered the violation of his constitutional rights as alleged herein as a result of customs, policies and/or practices of Defendant City and County of San Francisco, including but not limited to customs, policies and/or practices of failing to fully and fairly investigate allegations of criminal conduct, and failure to train officers with regards to intervention in landlord tenant disputes. Plaintiffs are informed and believe and thereupon allege that the misconduct alleged herein was caused by a policy of deliberate indifference of the Defendant City and County of San Francisco and/or other high ranking police department officials and/or supervisors, with regard to the need for more or different training and/or supervision and/or discipline of its police officers.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1. General damages in an amount to be determined according to proof at trial;

2. Special damages, including but not limited to wage loss and/or damage to career; attorneys' fees, court costs and/or other out of pocket expenses incurred in connection with the underlying criminal charges and/or false arrest alleged herein;

3. For costs and reasonable attorneys fees pursuant to 42 U.S.C. § 1988;

4. Punitive damages against the individual Defendants in an amount to be determined according to proof at trial;

5. For prejudgment interest as permitted by law;

-10-

COMPLAINT

1    6.  For such other relief as the court may deem just and proper.

2    Dated: June 29, 2007                LAW OFFICES OF KENNETH FRUCHT

3

4

5                                        Kenneth N. Frucht
6                                        Attorney for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-

**COMPLAINT**

# EXHIBIT C

# TO DECLARATION OF
# DONALD P. MARGOLIS

1            UNITED STATES DISTRICT COURT

2

3            NORTHERN DISTRICT OF CALIFORNIA

4

5                                        **CERTIFIED**
   Ronald Green,                          **COPY**
6
             Plaintiff,
7
   -vs-                          CASE NO.   C 07-3433 MMC
8
   CCSF, Thomas Abrahamsen,
9  Lorenzo Adamson, David Oberhoffer,
   Jerry King, Michael Williams,
10 Ramon Bunag, Esther Granizo,
   And Does 1-50, inclusive,
11
             Defendants.
12 _____/

13

14

15        <u>**DEPOSITION OF ERIKA FALK, PSY.D.**</u>

16           **Monday, August 11th, 2008**

17

18

19        REPORTED BY:  GINA L. PETERSEN
                        CSR NO. 9447
20

21

22        **BONNIE L. WAGNER & ASSOCIATES**
          **41 SUTTER STREET, SUITE 1605**
23        **SAN FRANCISCO, CA  94104**
               **(415) 982-4849**
24

25

1    A.  Fair enough.

2    Q.  And there may be points where one of us asks a

3  question, and then the other lawyer makes an objection,

4  and that is an objection for the record.  It doesn't

5  affect your obligation to answer the question once the

6  objection is made.

7         I don't know that I foresee it, but, at times, an

8  objection is followed by an instruction not to answer in

9  which case you don't answer.  That is relatively uncommon.

10        Without further adieu, why don't you, first,

11  Dr. Falk, summarize for me your professional credentials,

12  and my apologies for the jackhammering going on.

13  Fortunately, this is not a videotaped deposition.

14    A.  I hold a Doctorate in clinical psychology.  I

15  obtained that degree from the Wright Institute in Berkeley

16  in 2001.

17        My degree is called a Psy.D, which is a Doctorate

18  of Psychology.  It emphasizes integrated clinical and

19  practicality training in addition to theoretical course

20  work.

21        I am also a licensed psychologist.  I obtained my

22  license in 2005.  My current professional position is at

23  the Institute on Aging where I am the Director of the

24  Geriatric Assessment Service and a Director of the

25  San Francisco Elder Abuse Forensic Center.

1    person have the capacity to change their will?  Do they

2    have the capacity to manage their finances or to live

3    independently?"

4         To answer those questions, I gather objective

5    data by using psychological instruments and tests and also

6    review available medical records and interview collateral

7    sources, who may have information to bring.

8         Q.  When you say "collateral sources," what do you

9    mean?

10        A.  For example, if someone were to refer their

11   mother to me to evaluate the question of whether or not

12   that person has dementia, the person who I am interviewing

13   and testing, who is the client, may have cognitive

14   impairments and may not be a reliable reporter about their

15   own experience.

16        In such cases, I may interview others who would

17   have information who could explain to me what impairments

18   or difficulties they were observing.

19        Q.  Okay.  What was your prior employment?

20        A.  Prior to coming to the Institute on Aging, I was

21   employed at Jail Psychiatric Services.

22        Q.  And approximately what was your range of dates of

23   employment at Jail Psychiatric Services, which I may refer

24   to as "JPS"?

25        A.  Okay.  I was there from approximately June of

1    2005 to June of 2006.

2        Q.  So you worked for a time both at JPS and at the

3    Institute on Aging?

4        A.  Correct.

5        Q.  Divided your time?

6        A.  Yes, my work with the Institute on Aging at that

7    point was as a contractor, so yes.

8        Q.  Before we go into what your employment

9    responsibilities were at JPS, would you tell me, just so I

10   have a general idea of how long this questioning will be,

11   what was your employment prior to JPS, if any?

12       A.  Prior to JPS, I worked for center -- Center for

13   Victims of Torture, and I worked in Guinea Conakry in West

14   Africa, and I worked on a project for two years where I

15   taught Liberian and Sierra Leonean refugees about trauma

16   counseling in their refugee camps in India.

17       Q.  Did you read that book written by the Sierra

18   Leonean survivor?

19       A.  A Long Way Gone?

20       Q.  Yes, fascinating.  What was the name after

21   "Guinea"?  What was the word you used?

22       A.  Conakry.

23       Q.  How do you spell that?

24       A.  Conakry, C-o-n-a-c-r-y (sic).  It's the country

25   just called "Guinea," but there are many Guineas.  There

1      A.  No.

2      Q.  I would like to -- have you completely summarized

3  for me the screening function or were there any other

4  tasks that come to mind?

5      A.  I could mention what the possible dispositions

6  would be, but I did describe the screening function.

7      Q.  Why don't you elaborate a bit on possible

8  dispositions, what your range was?

9      A.  Dispositions ranged from no further action, doing

10  nothing, to recommending a follow-up visit by another JPS

11  clinician within a specified period of time, to

12  recommending various degrees of sheltered housing within

13  the jail, to recommending psychiatric hospitalization via

14  an involuntary hold also known as a 5150.

15      Q.  Do you know where the term "5150" comes from?

16      A.  I believe it is the Welfare and Institutions

17  Code.

18      Q.  What is your understanding of what the bases were

19  for a 5150 hold?

20      A.  Danger to self, danger to others, grave

21  disability.

22      Q.  At the risk of asking you for an obvious answer,

23  what does "danger to self" mean for purposes of 5150

24  dispositions?

25      A.  That a person has verbalized or demonstrated or

1    once previously during the last time he was in custody in

2    1995.  He was screened by a JPS clinician after his mother

3    found a note she thought indicated suicidal ideation."

4         Can you tell me where you got that information?

5    A.  My best approximation is that this information

6    was found in the Jail Psychiatric Services electronic

7    record.

8         Q.  If the source of the information was the patient,

9    would you note that?

10    A.  Yes.

11    Q.  Are you fairly certain that the patient did not

12    disclose the information under "History JPS" to you?

13    A.  Yes.

14    Q.  In the next entry there is a reference -- Well,

15    the terms are, quote, "Suggested the counselor was

16    incompetent," close quote.

17         Are you attributing those comments to Mr. Green?

18    What is the relevance, if any, of that comment?

19    A.  It indicated that he had an unsuccessful

20    relationship with a mental-health practitioner.

21    Q.  You say toward the bottom of the document -- you

22    answered "yes" -- correct me if I'm wrong, you answered

23    "yes" to the question whether he is -- Mr. Green was

24    currently at imminent risk for dangerousness, first page

25    towards the bottom, about eight lines toward the bottom.

1          Do you see that?

2     A.  Yes.

3     Q.  On what did you base that answer of "yes"?

4     A.  I based that on Officer Kelly Dunn's report, as I

5 noted under this section.

6     Q.  Was that the sole basis for your determination

7 that Mr. Green was at imminent risk for dangerousness?

8     A.  No.

9     Q.  What were the other reasons?

10    A.  Another basis, as noted under the Cognition

11 Section, was that he displayed what assessed to be a

12 delusional system involving his housemates and possibly

13 his ex-girlfriend's family.  He claimed that those

14 individuals were poisoning his food, giving him rashes

15 with a powder, moving and scratching his objects.

16    Q.  Okay.  Before you go on further, couldn't all of

17 this have been true?

18         Do you take into consideration the plausibility

19 of the account?

20    A.  It could have been true.  Although, it would have

21 been extremely unlikely.

22    Q.  So you made a judgment, based upon your training

23 and experience, that Mr. Green's comments about poisoning

24 and the other things that he mentioned were evidence of a

25 delusional way of thinking?

1    A.  Yes.

2    Q.  Did you conclude that Mr. Green's thought content

3    was within normal limits?

4    A.  No.

5    Q.  And describe for us what that means.  What do you

6    mean when you say "thought content"?

7    A.  "Thought content" is often used in contrast to

8    thought form, which is the way someone thinks.

9        For example, thought form may have to do with a

10   flight of ideas, how rapid, how connected thoughts are;

11   thought content is what someone is thinking.

12       In this case, he indicated that he believed the

13   neighbors planned to poison and intimidate him by giving

14   him rashes, putting hair in his food and moving objects

15   and replacing them, and it appears here that I quoted him

16   as saying, "They are committing fraud and using an

17   outsider to pay expenses.  Mentally they assigned a

18   different person to me.  It enhances their viewpoint, and

19   I become the scapegoat," end quote.

20   Q.  Is that kind of language emblematic of a

21   particular condition?

22   A.  It suggests to me that that is a paranoid way of

23   thinking.

24   Q.  And does that paranoid way of thinking, in your

25   view, bear on Mr. Green's propensity to harm others?

1    A.  There is a link between paranoia and

2  propensity -- a possibility of harming others, yes.

3    Q.  Does the thought content that you observed in

4  Mr. Green impact his reliability as a historian?

5    A.  Yes.

6    Q.  In what way?

7    A.  As noted here, his logic is faulty, and he lacks

8  insight into his behavior.

9    Q.  Would that mean that you would look more

10  skeptically at his account of an occurrence, say, between

11  him and his landlord?

12    A.  Yes.

13    Q.  And why is that?

14    A.  Because his perception is skewed due to his

15  paranoia.

16    Q.  You say a little bit further down on the second

17  page, which has been stamped 4, that his impulse control

18  is within normal limits; correct?

19    A.  Yes.

20    Q.  And then you say, "Currently calm and cooperative

21  but when his delusional system is changed, he might act

22  out as his current charges indicate."

23      Can you explain to me what you meant by that?

24    A.  He was not impulsive at the time that I

25  interviewed him.  He was not demonstrating threat toward

1    this document whether Mr. Green corroborated an account of

2    his having stocked weapons?

3        A.  I do not recall.

4        Q.  So, the second to last entry on page 3 is your

5    plan; right?

6        A.  Yes.

7        Q.  Is that what you call your disposition?

8        A.  Yes.

9        Q.  What was your disposition?

10       A.  To institute a 5150 as a danger to others.

11       Q.  And to place Mr. Green where?

12       A.  In the safety cell; although, that was, I

13   believe, a Sheriff Department and/or Jail Psychiatric

14   Services protocol that every person that is on a 5150

15   automatically is housed in a safety cell.

16       Q.  For a limited period of time or the duration?

17       A.  Or until they are picked up to be taken to the

18   hospital, and my understanding is that there is a time

19   limit by which the hospital must come to pick that person

20   up.

21       Q.  In Mr. Green's instance, who made the

22   determination to place him on a 5150 hold?

23       A.  I did.

24       Q.  Did you make that determination in collaboration

25   with anyone else?

1    A.   I do not recall.

2    Q.   Would you have expected that you would make that

3 determination in collaboration with anybody else?

4    A.   Not always.

5    Q.   Sometimes "yes" and sometimes "no"?

6    A.   Sometimes "yes" and sometimes "no".

7    Q.   Did you make the 5150 hold determination in

8 deference to a recommendation from the San Francisco

9 Sheriff?

10    A.   The Sheriff's Department is not able to render an

11 opinion about whether or not someone should be 5150'd

12 or not.

13    Q.   So what the Sheriff's Department preference or

14 opinion is on that matter does not matter; is that

15 correct?

16    A.   Correct.

17    Q.   And same question for the San Francisco Police

18 Department?

19    A.   Within the confines of my clinical task at Jail

20 Psychiatric Services, I could hear input from collateral

21 sources, but was in a position to make independent

22 clinical judgment about whether or not someone should be

23 5150'd.

24    Q.   And you did not defer to the judgment of -- or

25 did you defer to the judgment, carry out the judgment of a

1   San Francisco Police Department representative in making

2   your 5150 determination?

3       A.  No.  I took their information in an effort to

4   understand their concerns, and then I conducted my own

5   assessment.

6       Q.  Okay.  And made your own independent

7   determination?

8       A.  Yes.

9       MR. MARGOLIS:  Let's mark as Exhibit B a

10  multiple-page document bearing numbers 50 through --

11  series of documents bearing the numbers 50 through 57.

12                  (Whereupon, Defendants' Exhibit B

13                  was marked for identification.)

14  BY MR. MARGOLIS:

15      Q.  Please take a moment, Dr. Falk, and look at the

16  first page of this Exhibit B.

17          After you have concluded your review, would you

18  tell me what it is.

19      A.  Are you asking me to comment simply on the first

20  page?

21      Q.  Yes.

22      A.  It is an application for a 72-hour detention for

23  evaluation and treatment.

24      Q.  Under Section 5150 and the following sections --

25      A.  Yes.

1    A.  No.

2    Q.  Were you expected each to exercise your

3  independent judgment when dealing with a patient?

4    A.  Yes.

5    Q.  Okay.

6    A.  And I could also say that if there were a

7  particular behavior plan for someone, that would be

8  explicitly stated in the notes so that people would

9  practice consistently based on if a behavioral plan were

10  initiated.

11       MR. MARGOLIS:  Okay.  This is G.  This is a

12  three-page document numbered 33 through 35.

13            (Whereupon, Defendants' Exhibit G

14             was marked for identification.)

15  BY MR. MARGOLIS:

16    Q.  Dr. Falk, is Exhibit G another reassessment note

17  by Ms. Dalmacio, and I know you will want to take a

18  minute?

19    A.  Yes.

20    Q.  It appears, based upon the document, that it was

21  prepared on or about October 21, 2005; is that correct?

22    A.  Correct.

23    Q.  You will notice on the reference, four or five

24  lines down, "The client is being released from custody and

25  has a quote, 'Do not release without JPS eval,' on his

1  I, **GINA PETERSEN, CSR,** hereby certify: I am a duly

2  qualified Certified Shorthand Reporter in the State of

3  California, holder of Certificate No. 9447 issued by the

4  Court Reporter's Board of California and which is in full

5  force and effect. (Fed. R. Civ. P. 28[A]).

6       I am authorized to administer oaths or

7  affirmations pursuant to California Code of Civil

8  Procedure, Section 2093(b), and prior to being examined,

9  the deponent was first duly sworn by me, (Fed. R. Civ. P.

10  28(a), 30(f)(1)).

11       I am not a relative or employee or attorney or

12  counsel of any of the parties, nor am I a relative or

13  employee of such attorney or counsel, nor am I financially

14  interested in this action. (Fed. R. Civ. P. 28). I am the

15  deposition officer that stenographically recorded the

16  testimony in the foregoing deposition and the foregoing

17  transcript is a true record of the testimony given by the

18  deponent. (Fed R. Civ. P. 30(f) (1)).

19       Before completion of the deposition, review of

20  the transcript [  X ] was [ ] was not requested. If

21  requested, any changes made by the deponent (and provided

22  to the reporter) during the period allowed, are appended

23  hereto. (Fed. R. Civ. P. 30(e)).

24  GINA PETERSEN, CSR No. 9447   Dated: August 21st, 2008

25  _Gina Petersen_                _August 21, 2008_

BONNIE L. WAGNER & ASSOCIATES                    73