# EXHIBIT D

# TO DECLARATION OF
# DONALD P. MARGOLIS

COPY

1

2

3  SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

HONORABLE LUCY KELLY MCCABE, JUDGE

DEPARTMENT NO. 10

---oOo---

```
THE PEOPLE OF THE STATE)
OF CALIFORNIA,        )  COURT NO. 2228114
                      )
            PLAINTIFF, )
                      )
    VS.               )
                      )
RONALD GREEN,         )  422 PC
                      )  245(A)(2) PC
            DEFENDANT. )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

PRELIMINARY HEARING

AUGUST 12, 2005

A P P E A R A N C E S:

```
FOR THE PEOPLE:          KAMALA HARRIS
                         DISTRICT ATTORNEY
                         BY:  BRADEN WOODS
                         ASSISTANT DISTRICT ATTORNEY


FOR THE DEFENDANT:       JEFF ADACHI
                         PUBLIC DEFENDER
                         BY:  PETER FITZPATICK
                         DEPUTY PUBLIC DEFENDER
```

REPORTED BY:  RHONDA FUNG, CSR #4819

i

## I N D E X

### WITNESSES

FOR THE PEOPLE:

RAMON BUNAG                                                    PAGE
    Direct...............................................1
    Cross...............................................10

THOMAS ABRAHANSEN
    Direct.............................................29
    Cross..............................................34

### EXHIBITS

FOR THE PEOPLE:

| NUMBER | ITEM | IDENT. | EVID. |
|---|---|---|---|
| 1 | 8-by-11 paper with three smaller black and white photos attached | 33 | 44 |

FOR THE DEFENDANT:

| LETTER | ITEM | IDENT. | EVID. |
|---|---|---|---|
| A | Handwritten statement by Mr. Bunag | 10 | |
| B | Title company record | 13 | |
| C | Inspector's notes of conversation with Mr. Bunag | 20 | |
| D | CAD | 37 | |

---o0o--

1

FRIDAY, AUGUST 12, 2005                           MORNING SESSION

P R O C E E D I N G S

THE COURT:  This is line 29, Ronald Green.  Appearances,
please.

MR. WOODS:  Good morning, Your Honor.  Braden Woods for the
People.

MR. FITZPATRICK:  Good morning.  Peter Fitzpatrick on behalf
of Mr. Green.

THE COURT:  People call?

MR. WOODS:  Ramon Bunag.

THE COURT:  Could you stand up, please, and be sworn?

RAMON D. BUNAG,

called as a witness on behalf of the People, being duly
sworn, testified as follows:

THE CLERK:  Can you please state and spell your name for the
record?

THE WITNESS:  Ramon D. Bunag.

THE COURT:  How do you spell your last name?

THE WITNESS:  B, as in boy,-U-N-A-G.

THE COURT:  Thank you.  Have a seat, Mr. Bunag.  Mr. Woods.

MR. WOODS:  Thank you, Your Honor.

DIRECT EXAMINATION

MR. WOODS:  Q.  Good morning, sir.  Sir, do you own a
residence at 1 Santa Barbara Street here in the City and County
of San Francisco?

A.  Yes.

Q.  How long have you owned that?

A.  About a year ago.

2

```
1   Q.  About a year ago?

2   A.  Year ago, yeah.

3   Q.  Do you own it by yourself or do you have other people who own

4   it with you?

5   A.  Four owners for which I'm a co-owner.

6   Q.  Do you live at that residence?

7   A.  I don't live there.

8   Q.  Do you rent it out?

9   A.  We rent it out.

10  Q.  I want to take you back to July 26th of the year 2005.  Were

11  you renting it out at that time?

12  A.  I was there on July 26th.

13  Q.  Did you rent it to anybody at that time?

14  A.  Yes.

15  Q.  Who?

16  A.  Ronald Green.

17  Q.  Do you see Mr. Green in court today?

18  A.  Yes.

19  Q.  Could you point to him and briefly describe what he's

20  wearing?

21  A.  That guy wearing the orange suit.

22       THE COURT:  It's the defendant for the record.

23       MR. WOODS:  Thank you, Your Honor.

24  Q.  Sir, did you go to 1 Santa Barbara Street on July 26th, 2005?

25  A.  Yes.

26  Q.  Why did you go there?

27  A.  Because of the call coming from one of the tenants living

28  upstairs, Clarita Calabia.
```

3

1   Q.   And is it Clarita, C-L-A-R-I-T-A, Calabia, C-A-L-A-B-I-A?

2   A.   Exactly.

3   Q.   She was one of your tenants at the Santa Barbara address?

4   A.   One of the tenants.

5   Q.   Where did she live?

6   A.   She lives at 1 Santa Barbara upstairs.

7   Q.   Where did Mr. Green live?

8   A.   She [sic] live down below in the in-law.

9   Q.   The defendant lived in the in-law unit?

10  A.   She -- he lives in the in-law unit.

11       MR. FITZPATRICK:  I'm sorry, Your Honor.  I meant to do a

12  motion to exclude all non-testifying witnesses.  I have Miss

13  Calabia here as my witness.

14       THE COURT:  Is she here?

15       MR. FITZPATRICK:  She's walking.

16       THE COURT:  Is Miss Calabia here?

17       MR. WOODS:  Yes.

18       MR. FITZPATRICK:  Thank you.

19       MR. WOODS:  Q.  You got a call from Miss Calabia?

20  A.   Yes.

21  Q.   What happened?

22  A.   Miss Calabia informed me that Mr. Ronald Green already took

23  possession by force of the property.

24       MR. FITZPATRICK:  Objection, Your Honor.  Hearsay.

25       MR. WOODS:  It's not for the truth, Your Honor.

26       THE COURT:  It's not offered for the truth.

27       MR. FITZPATRICK:  So if it could just be limited to that.

28       THE COURT:  Okay.

4

1    MR. FITZPATRICK:  Thank you.

2    MR. WOODS:  Q.  She called you and what?

3  A.  Miss Calabia told me and informed me that she went to the

4  site and informed me that Ronald Green took possession of the

5  property by force.

6  Q.  What did you do based on that information?

7  A.  I suddenly went to the site and hurriedly asked Miss Calabia

8  to set aside on the left wing of the building, and she went to my

9  car.

10  Q.  So you went to 1 Santa Barbara?

11  A.  Yes.

12  Q.  You spoke with Miss Calabia?

13  A.  Yes.

14  Q.  What did you have her do?

15  A.  I beg your pardon?

16  Q.  What did you have Miss Calabia do?

17  A.  I asked Miss Calabia to set aside and go to my car, you know,

18  to calm down because she's already crying.

19  Q.  What did you do?

20  A.  I tried to open the door.

21  Q.  Which door did you try to open?

22  A.  The security door in between the main door.

23  Q.  Is this at your residence at 1 Santa Barbara?

24  A.  At our residence 1 Santa Barbara.

25  Q.  So you tried to open the security door.  What happened?

26  A.  It didn't work.

27  Q.  Did you try to use a key?

28  A.  I tried to use the key.  It didn't work.

5

1    Q.   What happened then?

2    A.   All of a sudden, I saw the movement upstairs within the main

3    wood door is opening, and I saw Ronald Green with his long rifle

4    pointing at me; and he told me, "From now on, I am the owner of

5    this property.  If you try to move in, you're dead out."

6         MR. FITZPATRICK:  Objection.  Move to strike.  Hearsay.

7         THE COURT:  It may be an admission, so make a motion to

8    strike after I hear the rest of this.

9         MR. WOODS:  Q.  Sir, when you talk about the security door

10   and the brown door --

11        THE COURT:  Besides -- let me interrupt you a second -- I

12   don't think it's offered for the truth that he's the owner of the

13   property.

14        MR. FITZPATRICK:  But it's offered for the truth of any

15   statements made therein.

16        THE COURT:  Okay.  Reserve right.  I'll reserve ruling.

17        MR. WOODS:  Thank you, Your Honor.

18   Q.   So you go to the front door at 1 Santa Barbara?

19   A.   I tried to open the security door so I can go in and see what

20   is really going on, if he really is on the property because Mr.

21   Ronald Green has no access to our portion of the upper portion of

22   the property.

23        THE COURT:  Okay.  Does that mean the in-law unit has a

24   separate entrance?

25        THE WITNESS:  Only down below.

26        THE COURT:  Down below.  Okay.

27        MR. WOODS:  Q.  So you went to the front door where Miss

28   Calabia had leased the residence?

6

1    A.   Exactly.

2    Q.   So you couldn't get in the security gate, and then the main

3    door opened?

4    A.   It did open.

5    Q.   What happened?

6    A.   What happened was -- no.  I tried to open the security door,

7    but when I about to open the security door, I saw movement from

8    the main wood door wherein Ronald Green is going out and that he

9    brought along with him a long rifle pointing at me, and he made a

10   statement.

11   Q.   When you say, "a long rifle," you mean a gun?

12   A.   Yes.

13   Q.   When you say the defendant pointed the gun at you, could you

14   tell what part of your body the gun was pointed at?

15   A.   Right in front of my face.  He's 45 degrees with the butt in

16   in the shoulder (indicating).

17        THE COURT:  Indicating the stock in his left shoulder.

18        THE WITNESS:  Actually, I don't know if it's left or right

19   actually.  I do not know if he's left handed or right handed, but

20   then I knew that he's not joking because the butt, the butt of

21   the gun of the long rifle is in the shoulder.

22        MR. WOODS:  Q.  And the barrel end is pointing towards you?

23   A.   Forty-five degrees towards me.

24        MR. FITZPATRICK:  Objection.  Move to strike as speculative

25   that my client wasn't joking.

26        THE COURT:  Okay.  I'll strike "wasn't joking."

27        MR. WOODS:  Q.  So the defendant has a gun pointed at your

28   face?

1   A.  At my face.  I saw the barrel pointing at me.

2   Q.  And how far away was the defendant from you when he was

3  pointing the barrel of the rifle in your face?

4   A.  About six to eight feet.  Far apart.

5   Q.  Six to eight feet?

6   A.  Far apart, yes.  Forty-five degrees down.

7   Q.  And what did the defendant say to you when he had the gun

8  pointed at your face?

9   A.  He told me, "From now on, I'm the owner of this property. And

10  if you try to move in, you're dead out."

11   Q.  How did that make you feel?

12   A.  I feel trembling right away, and I run.  I run from his back

13  right away.

14   Q.  You ran away.  When you ran away, you were trembling?

15   A.  I was trembling.

16   Q.  Were you afraid?

17   A.  I was afraid and I was really terrified for the situation,

18  and I run away to my car and speed up.

19   Q.  Did you call the police?

20   A.  I called the police.

21   Q.  Sir, does the residence at 1 Santa Barbara have a garage?

22   A.  It has a garage.

23   Q.  And did Clarita have access to the garage?

24   A.  She shared half because the authority people will only lease

25  half portion of the garage, but then as early as February for

26  which he didn't pay, he took over 100 percent of possession of

27  the whole garage and the storage by force.

28     MR. FITZPATRICK:  Objection and move to strike.  Lacking

8

1  foundation.

2      THE COURT:   Would you lay the foundation for that conclusion,

3  if you can.

4      MR. WOODS:   Q.   Sir, the lease agreement you have with

5  Clarita, did it provide access to half of the garage?

6  A.   Yes.

7      MR. FITZPATRICK:   Objection.   That reference is a hearsay

8  document, and it violates the best evidence rule.

9      THE COURT:   Overruled.

10     MR. WOODS:   Q.   Did the lease agreement with the defendant

11 also provide that he have access to half the garage?

12 A.   Half of the garage, yes.

13 Q.   In terms of being the owner, did you have keys to the

14 residence?

15 A.   Only to the front door.

16     THE COURT:   Upstairs?

17     THE WITNESS:   The front door.   Yeah, upstairs.

18     MR. WOODS:   Q.   Sir, approximately when did the defendant

19 initially move into Santa Barbara?

20 A.   He moved in as early as January because of the trust.   He is

21 our handyman/contractor in the year 2004, and because of the

22 trust we giving him a decent place to live, complete kitchen,

23 complete bath and discounted rent.

24 Q.   So that started about January 2005?

25 A.   That happened in January 2005.

26 Q.   You indicated you gave the defendant discounted rent.   Was

27 there a time that he stopped paying rent?

28 A.   February, he made a Hollywood-style drama.   He put up --

9

```
 1        MR. FITZPATRICK:  Objection, Your Honor.  Non-responsive and
 2   also irrelevant.
 3        THE COURT:  The question is:  Did he stop paying rent?
 4        THE WITNESS:  He stopped paying rent from February to date.
 5        MR. WOODS:  Q.  So starting in February 2005 till today's
 6   date, the defendant stopped paying you rent?
 7        MR. FITZPATRICK:  Objection.  Asked and answered.
 8        THE WITNESS:  He stopped paying.
 9        THE COURT:  Overruled.  It's clarification.
10        THE WITNESS:  He stopped payment of the rent.
11        MR. WOODS:  Q.  Did you proceed to try to -- eviction
12   proceedings against the defendant?
13   A.  Comes May, because February to May we giving him breathing
14   space.  We tried to give him breathing space so much so that he
15   could be able to repay back, but then May we have no choice but
16   to go to the Sheriff's office.  The Sheriff's office successfully
17   giving him the three-day vacate notice.  Essentially, we giving
18   him a 30-day to vacate notice so much so that we could be able to
19   facilitate the legal proceedings, and he refuse the 30 days
20   vacate notice.
21   Q.  So that was in May of 2005?
22   A.  May of 2005.
23   Q.  And lastly, sir, I may have asked you this, the residence at
24   1 Santa Barbara is here in the City and County of San Francisco?
25   A.  It's here in the City and County of San Francisco.
26        MR. WOODS:  Thank you, sir.  I have nothing further at this
27   time.
28        THE COURT:  Mr. Fitzpatrick.
```

10

1      MR. FITZPATRICK:  Thank you.

2                      CROSS-EXAMINATION

3      MR. FITZPATRICK:  Q.  Mr. Bunag, you wrote a statement in

4   this case, isn't that right, on the date of the incident?  Is

5   that right?

6   A.  Yes.

7   Q.  And you signed that under the penalty of perjury; is that

8   right?

9   A.  Yes.

10     MR. FITZPATRICK:  May I have defense A marked, You Honor?

11  It's a handwritten statement by Mr. Bunag.  Showing the People.

12     THE COURT:  Sure.

13     MR. WOODS:  I believe it's a little premature at this point.

14  That's fine.

15     MR. FITZPATRICK:  May I have it marked, please?

16     THE COURT:  Yes.  Defense A.

17                         (Defendant's Exhibit A marked for

18                          identification.)

19     MR. FITZPATRICK:  Thank you.

20     MR. FITZPATRICK:  Q.  Now, Mr. Bunag, you just testified on

21  direct examination when the District Attorney was asking you

22  questions that you went to 1 Santa Barbara on 7/26/2005; is that

23  right?

24  A.  Yes.

25  Q.  But that's not accurate, is it?

26  A.  July 26th, you know, because I did not read the case because

27  of the -- every time I read the case, I get traumatic.  I really

28  remember what happened sometime in July 26th when that scenario,

11

1  that pointing of the gun where the police arrived was July 26th.

2  Q.  Okay.  Well, you signed the statement under the penalty of

3  perjury, correct?

4  A.  Exactly.

5  Q.  And you testified just now under the penalty of perjury,

6  correct?

7  A.  Exactly.

8  Q.  But in your statement that you wrote, you said this happened

9  on July 28th, 2005?

10  A.  I just mentioned to you, attorney, that I really don't have

11  the recollection of the specific date because the police was

12  there also.

13  Q.  Would it refresh your recollection to review a copy of your

14  statement?

15  A.  As I've said, the exact date I really do not know, but then

16  in the July 26th date it happened, it happened because the police

17  was there and I came with the presence of one of the police

18  officers, including their high rank officers.  I do not know.

19  Q.  Would you like to see your statement to see what date it

20  happened?  Would it help you?

21  A.  Yeah.  Okay.

22  Q.  Thank you.

23      May I approach the witness, Your Honor?

24      THE COURT:  Yes.

25      MR. FITZPATRICK:  Thank you.

26  Q.  Take a look to review that statement, sir, and see what date

27  you signed that statement.

28  A.  July 28th, exactly.

12

1  Q.  So you signed under penalty of perjury that this, in fact,

2  happened on July 28th; is that right?

3  A.  So it's July 28th, not July 26.

4  Q.  So when you just testified under penalty of perjury, that was

5  in error?

6  A.  I replace now -- not actually replacing because I have no

7  specific recollection of the date.  But then the real happening

8  of the event, I do not know.  But what was signed is the most

9  important thing, the July 28th.  For me, that important thing --

10      THE COURT:  Okay.  You've answered the question.

11      MR. FITZPATRICK:  Q.  Now you testified too on direct

12  examination that you've owned the property for about a year; is

13  that right?

14  A.  Exactly.

15  Q.  But then there's a title company report that shows that you

16  bought the property in March of 2005; isn't that right?

17  A.  It was only recorded.

18      MR. WOODS:  Objection.  No foundation.

19      THE COURT:  Sustained as to what the title report says.

20      MR. FITZPATRICK:  Q.  Well, did you bring a title company

21  report to court with you today?

22  A.  Because of the hurriedness, I did not extract the copy of my

23  Xerox copy of the grant title.  But it was only recorded.

24  Q.  Mr. Bunag, please answer just my questions.  If you don't

25  understand them, I'll repeat them.  Okay?  Please.

26  A.  Yes.

27  Q.  Did you bring a title company report today with you to court?

28  A.  Hold it.  I will check if I have something here with me.

13

1  Q.  Didn't you give me this?

2      THE COURT:  Why don't you show him.  I can't see it.

3      MR. FITZPATRICK:  Can I have this marked as defense B,

4  please?

5      THE COURT:  Yes.

6                          (Defendant's Exhibit B marked for

7                           identification.)

8      MR. FITZPATRICK:  Q.  Sir, handing what's been now marked as

9  defense B.  I'm going to ask you if you brought this to court

10  with you and handed it to me earlier?

11  A.  This comparable or title profile of the property which was

12  recorded.

13  Q.  Mr. Bunag, you need to listen to my question and answer it as

14  briefly as you can and directly.

15      Did you bring this document with you to court earlier and

16  hand it to me?

17  A.  I handed this document to attorney.

18  Q.  Yes or no.  You gave it to me?

19  A.  I gave it to him.

20  Q.  And it shows that you bought the property or the property was

21  recorded as you being the owner in April of 2005, correct?

22  A.  That was recorded in April of 2005, but then I owned the

23  property since 2004.  I keep on paying the co-owner the portion

24  of mine because we are co-owners, and I'm paying the principal

25  owner.

26  Q.  Mr. Bunag, there's no question before you.  My only question

27  was just that this is showing that you recorded as ownership in

28  April of 2005, correct?

14

1   A.   Exactly.

2   Q.   Now, you testified under direct examination that Mr. Green

3   was your handyman and contractor; is that right?

4   A.   Exactly.

5   Q.   For the property?

6   A.   Exactly.

7   Q.   So he would fix things on the property, right?

8   A.   On call.

9   Q.   Yes.

10  A.   If there's an order.

11  Q.   So if there's something that needed to be fixed, he would go

12  fix it, correct?

13  A.   Exactly.

14  Q.   And that was all over the property?

15  A.   Not all over the property.  Only on call.

16  Q.   I'm sorry?

17       THE COURT:  "Only on call."

18       THE WITNESS:  Only on call.  He's not paid retainer fee.

19       THE COURT:  Okay.  Wait, wait, wait.

20       MR. FITZPATRICK:  Judge, may we approach for a second?

21       (Off-record discussion at the bench.)

22       MR. FITZPATRICK:  All right.  Judge, at this time, I'd ask

23  for an admonishment to Mr. Bunag so we can try to hurry these

24  proceedings along.

25       THE COURT:  Mr. Bunag, try to answer the question and just

26  answer the question, okay?

27       THE DEFENDANT:  Yes, Your Honor.

28       MR. FITZPATRICK:  Thank you, Your Honor.

15

1    Q.   Okay, Mr. Bunag.   So he was the handyman/contractor for the

2    property, correct?

3    A.   Yes.

4    Q.   So he would fix anything either in one of the other tenants'

5    units or in the garage, correct?

6    A.   Yes, Your Honor [sic].

7    Q.   So he had keys for everybody's units?

8    A.   No.

9    Q.   But he had permission to fix things in anybody's unit if it

10   needed fixing?

11   A.   If he will fix it, yes.

12   Q.   Now prior to the date that you were describing, the 28th of

13   July, is it now?

14   A.   It's July 28th.

15   Q.   Okay.   Prior to that, you had tried to have Mr. Green

16   evicted, correct?

17   A.   Exactly.

18   Q.   And as a matter of fact, you told my investigator that you

19   were frustrated because you had called the police on Mr. Green

20   numerous times and they never did anything.   They told you it was

21   a civil matter, correct?

22   A.   Exactly.

23   Q.   And so it was frustrating you that you couldn't get him off

24   your property, right?

25   A.   It's not frustrating.   We're giving him breathing space.

26   Q.   It was making you mad that you couldn't get him off your

27   property, correct?

28   A.   Not actually mad because of the breathing space we're giving

16

1    him.

2    Q.   Okay.   You turned off his PG&E to try to get him to leave the

3    property, correct?

4    A.   The other co-owner did it, not coming from me.

5    Q.   You told the other co-owner, "Turn off his PG&E so that he'll

6    leave the property"?

7    A.   I did not.

8    Q.   You told the other co-owner, "Turn off his water so that

9    he'll leave the property"?

10   A.   I did not.

11   Q.   You never said that?

12   A.   I never said that.

13   Q.   All righty.   And you had called the police to try to get him

14   off the property, correct?

15   A.   We called the police so much so because of the call that

16   there's a house tie up on the part of Mr. Ronald Green.

17        THE COURT:   No.   Here's the question.   Had you called the

18   police before that day about Mr. Green?

19        THE WITNESS:   Prior to July 28th, one of the co-owners,

20   Esther Granizo, called the police.   While she's calling the

21   police, I was there as well, for which the police confiscated

22   five assorted firearms.

23        MR. FITZPATRICK:   Q.   You called the police numerous times?

24   A.   No, not me, not me calling the police.

25   Q.   You asked people to call the police on your behalf?

26   A.   No, not on my behalf.

27   Q.   So the police got called, but it was the other co-owners?

28   A.   The other co-owners called the police because the co-owners

17

1   live in the property, and she's the one.  She's affected by this.

2   Q.  All righty.  So you had never actually called the police

3   yourself?

4   A.  I never called the police myself.

5   Q.  But you knew the police had come and not done anything and

6   not made him leave?

7   A.  Will you please repeat your question?

8   Q.  You knew that the police had come to the property and not

9   done anything, not taken him off the property or done anything?

10  A.  No, the police are talking with him.

11  Q.  But they didn't make him leave, right?  They didn't make him

12  move out?

13  A.  They didn't make him move out.

14  Q.  And that made you upset?

15  A.  No, it didn't upset me.

16  Q.  No?  You sure?

17  A.  No, no.

18  Q.  You talked to an inspector on the 29th of July, correct?

19      THE COURT:  A policeman?

20      THE WITNESS:  A policeman or detective, I believe July 29.

21      MR. FITZPATRICK:  Q.  In a telephone conversation, right?

22  A.  Telephone conversation, yes.

23  Q.  And you told the inspector that Mr. Green had never put his

24  hands on you or struck you in any of the prior contacts you'd had

25  with Mr. Green?

26  A.  No.

27      THE COURT:  Yes, you said that?

28      MR. FITZPATRICK:  Q.  You told the inspector that?

18

1   A.   What was the question again?

2   Q.   That Mr. Green had never put his hands on you in any of your

3   prior contacts with him?

4   A.   I have no recollection that he squeezed me or anything.

5   Q.   He never touched you, right?

6   A.   I have no recollection.

7   Q.   And he never touched any of the other tenants, correct?

8   A.   No.

9   Q.   So he wasn't physically violent to anybody?

10  A.   No.

11  Q.   So when you say he took things over by force, he never

12  touched anybody and took things, right?

13  A.   Rephrase your question.

14  Q.   Sure.  You said he took the garage over by force, correct?

15  A.   Exactly.

16  Q.   But he didn't touch anybody and, say, push them or touch them

17  or do anything?

18  A.   He didn't touch, but verbally he informed everybody that they

19  have no access in the garage for which he reprogrammed the garage

20  so nobody will go in -- into the garage.

21  Q.   So you mean he said verbally, "You can't use the garage"?

22  A.   He informed the tenants, not me.

23  Q.   Okay, but he never used any force like physical violence to

24  take over the garage?

25  A.   No.

26  Q.   Okay.  So he never threatened anybody with a firearm before

27  this date, correct?

28       MR. WOODS:  Objection.  Speculation.

19

1    THE WITNESS:  No, there is --

2    THE COURT:  That you know of.

3    THE WITNESS:  I knew of the other call where the police

4  confiscated the firearms, the first five firearms.

5    THE COURT:  Okay.  Here's the question.  The question is:  Do

6  you know before this date whether he ever threatened anybody with

7  a firearm?

8    THE WITNESS:  I knew there is a threatening.

9    MR. FITZPATRICK:  Q.  But you told the inspector on the 29th

10  of July that you knew that he had a gun, but he'd never

11  threatened anyone with a firearm, didn't you?

12  A.  Again, again.

13  Q.  You told Inspector Harold in your conversation of July 29th

14  that with regards to Mr. Green that you knew he had a gun, but

15  he'd never threatened anybody with it before the 28th of July?

16  A.  He don't threaten me, but he threaten the other co-owner,

17  Esther Granizo.

18  Q.  But you said he never threatened anyone, and you meant

19  anyone, correct?

20  A.  My recollection is that I informed that not on myself, but on

21  the other co-owner, Esther Granzio, and that is why.

22  Q.  So are you testifying now that if you told Inspector Harold

23  that he never threatened anybody with a gun, that was in error?

24    MR. WOODS:  Objection.  Argumentative.

25    THE COURT:  Overruled.  Why don't you show him the statement?

26  It might speed this up some.

27    MR. FITZPATRICK:  Okay.  May I have this marked as defense

28  Exhibit C, please.

20

1          (Defendant's Exhibit C marked for

2          identification.)

3     THE COURT REPORTER:  Would you spell the last name Granizo?

4     THE WITNESS:  G-R-A-N-I-Z-O.

5     MR. FITZPATRICK:  All righty.  May I approach?

6     THE COURT:  Yes.

7     MR. FITZPATRICK:  Q.  Mr. Bunag, what I'd like you to do is

8  look at this document and read the first paragraph for me.

9     THE COURT:  Was this recorded?

10    MR. FITZPATRICK:  Not as far as I'm aware.

11    THE COURT:  This is the inspector's notes of his conversation

12  with you.

13    THE WITNESS:  Yes.

14    THE COURT:  Okay.

15    THE WITNESS:  The first paragraph indicated here that --

16    MR. FITZPATRICK:  Q.  You know, what I'm going to ask you is

17  when the inspector wrote --

18    MR. WOODS:  Objection.  No foundation.

19    THE COURT:  Sustained.

20    MR. FITZPATRICK:  Q.  Well, when the inspector wrote that you

21  said --

22    MR. WOODS:  Objection.  No foundation.

23    MR. FITZPATRICK:  -- to him --

24    THE COURT:  Why don't you just ask it another way.

25    MR. FITZPATRICK:  Q.  Did you say to the inspector that you

26  knew Mr. Green had a weapon, but he never threatened anybody with

27  it?  Didn't you say that to the inspector on July 29th?

28  A.  I told the inspector that he threatened not anybody except --

21

1    there are two things about the gun incident.   The first incident

2    was the call prior to July 28 was a call wherein Esther Granizo

3    is specifically mentioned to the police.

4         THE COURT:  Okay.  Stop.  Did you tell the inspector about

5    that call?

6         THE WITNESS:  I did not tell the inspector about that call --

7         THE COURT:  You did not?

8         THE WITNESS:  -- of Esther Granizo.

9         THE COURT:  Okay.

10        MR. FITZPATRICK:  Q.  And you never mentioned anything about

11   this alleged other incident to the inspector, did you?

12   A.  In my recollection, I did not.  I think I did not inform --

13   in my recollection, I think I did not -- I did not inform the

14   inspector about the other scenario wherein he didn't squeeze me

15   or put a gun on me.

16   Q.  All righty.  So now I want to turn your attention to the

17   actual incident that happened on July 28th, okay?  That was when

18   you came to the house allegedly.

19   A.  Yes.

20   Q.  Now you testified on direct examination that you tried to

21   open up the front security gate, and as you were doing so you saw

22   my client, Mr. Green, standing at the upstairs wood door; is that

23   right?

24   A.  I haven't seen him yet at that time.  I'm about to open the

25   ~~garage, the security grill door, and all of a sudden I saw~~

26   movement on the wooden door wherein I saw physically the presence

27   of Ronald Green.

28   Q.  Okay.  And you said he was shouldering a gun and pointing it

22

1   at you?

2   A.   Exactly.   About 45 degrees downward position.

3   Q.   And then you -- he said something to you like "You're not

4   coming in the house" or "It's my house now" or "If you try to

5   come in, you're dead on"?   Is that right?

6   A.   He specifically mentioned that "From now on, I'm the owner of

7   this property, and if you try to move in, you're dead out."

8   Q.   "Dead out"?

9   A.   Exactly.

10  Q.   You were terrified because of this, correct?

11  A.   I was terrified.

12  Q.   It was probably the scariest thing that ever happened to you

13  in your life; is that right?

14  A.   First time that a gun point on me, my person.

15  Q.   As a matter of fact, you wrote in your statement that you

16  thought it was an attempted murder; is that right?

17  A.   I believe he wants to shoot me because the butt of the gun is

18  in his shoulder.

19  Q.   Got you, because it was holstered or he was ready to shoot?

20  A.   Exactly.

21  Q.   So you got in your car with Miss Calabia and left; is that

22  right?

23  A.   And hurriedly left.

24  Q.   Sped away?

25  A.   Sped away and called the police.

26  Q.   In a parking lot down the street?

27  A.   In a parking lot down the street.   I go away and cruise

28  because the police said you have to go far away.

23

1   Q.   And you only called the police one time that day, right?

2   A.   I tried to call the police 911, but I cannot get the 911 so I

3   call the SFPD, for which they dispatched the police.

4   Q.   And you only made one phone call to the police that day,

5   right?

6   A.   Two phone calls, one 911.

7   Q.   You didn't talk to anyone?

8   A.   911 is a recording because I call on the cell phone.

9   Q.   So you didn't talk to anybody.  So you called the other end,

10  and you talked to somebody on your second call?

11  A.   The second is SFPD.

12  Q.   You only talked to one police officer that day regarding this

13  incident, correct?

14       THE COURT:  You mean on the phone or when they came or what?

15       MR. FITZPATRICK:  Q.  On the phone.  I'm sorry.

16  A.   On the phone?

17  Q.   Yes.

18  A.   I have no recollection one or two persons.  I don't know.

19  Q.   You only called one time and talked to one person.  Then the

20  police officers came out to where you were in the parking lot,

21  correct?

22  A.   I don't know if I made the two calls because I'm already

23  trembling at that particular moment, but I did make the phone

24  call, and I was interviewed.

25  Q.   All righty.  Now just with regard to this phone call you

26  made, this was made within minutes of this terrifying situation,

27  correct?

28  A.   It happened, exactly.

24

1  Q.  Like within two minutes?

2  A.  I have no recollection within two minutes because my first

3  focus is me and Clarita Calabia's safety from the scene.

4  Q.  But it wasn't more than 10 minutes, was it?

5  A.  I do not have recollection.  I do not know.  I speed up right

6  away.

7  Q.  Well, you went straight from the house to the parking lot

8  where you made the phone calls, correct?

9  A.  From the house to the car.  From the car, I did not call.  I

10  speed up and secure the safety of myself and Clarita Calabia.

11  Q.  And went straight to the parking lot where you made the phone

12  calls to the police?

13  A.  I made the phone call -- I have no recollection if it

14  happened in the lot, but when I speeded up I'm making a phone

15  call already because I put the cell phone right in my ear.

16  Q.  So as you were driving, you were calling the police?

17  A.  I do not have recollection if I was driving at the time, but

18  then I already called the police right after then.

19  Q.  All righty.  So immediately after the situation, as soon as

20  you felt safe, you called the police?

21  A.  I said I called the police right after the incident.

22  Q.  Okay.  So is it fair to say as soon as you felt safe and you

23  were away from the house, you called the police to tell them what

24  happened?

25      MR. WOODS.  Objection.  Asked and answered.

26      THE COURT:  Nothing else happened between the time you left

27  and the time you called the police, right?

28      THE WITNESS:  I beg your pardon, Your Honor?

25

1    THE COURT:  I mean it was pretty quick that you called the

2    police.  You do not remember specifically how long?

3    THE WITNESS:  I do know how long and to what time was it in

4    the parking lot or I'm already speeding, but my only recollection

5    is I called the police.

6    THE COURT:  Okay.  That's about the best we're going to do on

7    this one.

8    MR. FITZPATRICK:  Q.  All righty.  Well, nonetheless, during

9    the entirety of your phone call with the police officers, you

10   never said that my client pointed a gun at you, did you?

11   A.  The police --

12   THE COURT:  The question is did you tell them the defendant

13   pointed a gun at you in the phone call?

14   THE WITNESS:  The police asked me -- question me only for the

15   question that he's been telling me.

16   MR. FITZPATRICK:  Q.  Mr. Bunag, you never said to the

17   police, "He pointed a gun at me" in the phone call, did you?

18   A.  I did not tell him because he asked me questions.

19   THE COURT:  Okay.  Just yes or no.

20   THE WITNESS:  Your question again?

21   MR. FITZPATRICK:  Q.  You did not tell the police that he

22   pointed a gun at you?

23   A.  No.

24   Q.  As a matter of fact, you told the police that the last time

25   you had seen him with a gun was over a month before your phone

26   call, didn't you?

27   A.  A .45 caliber a month before.

28   Q.  And that was the last time you'd ever seen my client with a

26

1   weapon?

2   A.   I was surprised he has a weapon because all guns were already

3   confiscated.

4   Q.   You told the police in your tape recorded phone call that the

5   last time you'd seen Mr. Green with a weapon before making that

6   phone call was a month before?

7   A.   A month or two months ago.   I have no recollection, but I saw

8   him, a caliber.

9   Q.   But this was the most terrifying event in your entire life,

10  you thought it was an attempted murder, and you didn't tell the

11  police about it?

12  A.   Rephrase your question again.

13      MR. WOODS:   Objection.   Argumentative.

14      THE COURT:   Sustained.

15      MR. FITZPATRICK:   Q.   This was the most terrifying thing that

16  ever happened to you, and you didn't tell the police about it

17  when you called 911?

18      MR. WOODS:   Objection.   Asked and answered, argumentative.

19      THE COURT:   It is argumentative.   I get the point.

20      MR. FITZPATRICK:   Q.   Okay.   You couldn't even describe the

21  clothes that Mr. Green was wearing when you made that 911 call,

22  could you?

23  A.   Because I was scared.   Because of the spare of the moment, it

24  happened quickly, and I cannot make a recollection of what I was

25  questioned by the dispatch - by the police what he's wearing so

26  I asked Miss Calabia.   I have no recollection so I do not know

27  what he's wearing.

28  Q.   That's right, because you'd never seen him that day, right?

1    A.  I beg your pardon?

2    Q.  You couldn't tell the police what he was wearing because you

3    never saw him that day before you made the phone call?

4    A.  I saw him that day because he opened the door.

5    Q.  But you couldn't tell us what he was wearing?

6        THE COURT:  Asked and answered.

7        THE WITNESS:  Because I was looking --

8        THE COURT:  Hang on.

9        MR. FITZPATRICK:  Q.  You are just using the criminal charges

10   to get him evicted from that property, aren't you?

11   A.  No, Your Honor [sic].

12   Q.  Okay.  Have you cleared out his property from that location

13   since you had him arrested?

14       MR. WOODS:  Objection.  Irrelevant.

15       THE COURT:  Goes to bias, I think.  Overruled.  Have you

16   cleared Mr. Green's stuff out?

17       THE WITNESS:  No.

18       MR. FITZPATRICK:  Q.  It's still in his apartment?

19   A.  It's still in his apartment, and we're waiting for all the

20   legal proceedings.

21   Q.  And you claim that you never told anybody to shut off his

22   PG&E or his water?

23   A.  No.

24       MR. WOODS:  Objection.  Asked and answered

25       THE COURT:  The objection is sustained.

26       MR. FITZPATRICK:  If I could just have a moment, please.

27       (Off-record discussion between Mr. Fitzpatrick and the

28   defendant.)

28

1    MR. FITZPATRICK:  Thank you.  Nothing further at this time.

2    THE COURT:  Anything further?

3    MR. WOODS:  No.

4    THE COURT:  Thank you, Mr. Bunag.

5    THE WITNESS:  Thank you, Your Honor.

6    THE COURT:  Mr. Fitzpatrick, could I bifurcate briefly to

7    take Miss Moore's disposition?

8    MR. FITZPATRICK:  Sure.

9    THE COURT:  Will you agree to bifurcate the hearing, Mr.

10   Green?

11   THE DEFENDANT:  Yes, Your Honor.

12   THE COURT:  Thank you.

13   (Whereupon, the Court called unrelated calendar matters.)

14   THE COURT:  Mr. Green is present.  Thank you for your

15   courtesy in agreeing to split this hearing up.  You notice we got

16   rid of a lot of people in the courtroom.

17   People call?

18   MR. WOODS:  Officer Abrahansen.

19   THE COURT:  Would you step forward and be sworn?

20   THE CLERK:  Please raise your right hand.

21                    THOMAS ABRAHANSEN,

22   called as a witness on behalf of the People, being duly

23   sworn, testified as follows:

24   THE CLERK:  Will you please state and spell your name for the

25   record?

26   THE WITNESS:  My name is Thomas Abrahansen.  Last name is

27   spelled A-b-r-a-h-a-n-s-e-n.

28   THE COURT:  Thank you.  Would you be seated.

29

<u>DIRECT EXAMINATION</u>

1

2    MR. WOODS:  Q.  Good morning, sir.

3    A.  Good morning.

4    Q.  What do you do for a living?

5    A.  I'm a police officer with San Francisco.

6    Q.  How long have you been a police officer here in San

7    Francisco?

8    A.  Going on eight years.

9    Q.  Do you have any other prior law enforcement experience?

10   A.  No.

11   Q.  Were you on duty on July 28th of the year 2005?

12   A.  Yes.

13   Q.  Did you go to 1 Santa Barbara here in the City and County of

14   San Francisco?

15   A.  Yes.

16   Q.  What was the nature of the call?

17   A.  We responded to a call regarding a property owner and

18   dispute, including a gun.

19   Q.  When you say, "We," did you have a partner on that day?

20   A.  Officer Adamson.

21   Q.  You and your partner go to 1 Santa Barbara?

22   A.  Yes.

23   Q.  Describe what happened when you got there.

24   MR. FITZPATRICK:  Objection.  Vague.

25   THE COURT:  Overruled.

26   MR. WOODS:  Q.  Go ahead.

27   A.  We arrived at that address.  We'd been there before.  And we

28   were looking for complainants, which we didn't immediately see.

30

1   I knew that one of the people that I was looking for was -- had

2   lived in a lower unit at that address and looked for him there,

3   couldn't find him there, but shortly after he approached us from

4   upstairs.

5   Q.  When you say, "he," do you see that person in court today?

6   A.  Yes.

7   Q.  Could you point to him and describe what he's wearing today?

8   A.  He's sitting over there at the defense attorney's desk.  He's

9   wearing an orange sweatshirt, and I know him by "Mr. Ron Green."

10      THE COURT:  It's the defendant for the record.

11      MR. WOODS:  Thank you, Your Honor.

12  Q.  So, Officer, you looked for Defendant Green first at the

13  lower unit.  Couldn't find him?

14  A.  Yeah.

15  Q.  And then you saw him come from where?

16  A.  From the main entrance to the house, the upstairs.

17  Q.  When you say he came, where were you when the defendant

18  approached you?

19  A.  Down on the sidewalk.

20  Q.  So the defendant came out of the house, came down to you on

21  the sidewalk?

22  A.  Yes.

23  Q.  What happened then?

24  A.  Just tried to get some information from him to find out what

25  was going on.  I wanted to hear what he had to tell me.

26  Q.  Did you ask the defendant about weapons?

27  A.  Yes.

28  Q.  And what happened?

31

1    A.   Mr. Green told me that he had a rifle.

2    Q.   And what did you say in response?

3    A.   Well, I asked him a couple questions.  I immediately wanted

4    to know where that rifle was and make sure that it was safe for

5    me and my partner and everybody else there.

6    Q.   Did you ask the defendant where the rifle was located?

7    A.   Yes.

8    Q.   And what did he tell you?

9    A.   He told me it was in the garage of the house next to the tool

10   chest -- or toolbox.

11   Q.   What happened then?

12   A.   I asked him if it was okay with him if I went and got that

13   weapon.  I explained to him that I was worried about our safety

14   and his safety and would he mind if I retrieved it for everbody's

15   sake.

16   Q.   What was the defendant's response?

17   A.   He was very cooperative.  He didn't have a problem with that.

18   He said I could go in and get it.

19   Q.   When you were having this conversation with the defendant,

20   was he handcuffed?

21   A.   No.

22   Q.   Was he restrained?

23   A.   No.

24   Q.   Did you or your partner have your side arms out?

25   A.   No.

26   Q.   After the defendant told you it was okay to go get the rifle,

27   what did you do?

28   A.   I went upstairs to the open doors and went down into the

32

1  garage and located the rifle where he said it would be.

2  Q.  Did the defendant accompany you at that time?

3  A.  No.

4  Q.  He stayed outside?

5  A.  Yes.

6  Q.  Was the rifle where he said it was?

7  A.  Yes.

8  Q.  Did you examine the rifle?

9  A.  Yes.

10  Q.  Was it loaded?

11  A.  Yes.

12  Q.  Explain how so.

13  A.  The rifle had one round in the chamber, and there were four

14  rounds in the magazine, and the bolt was slid forward.  As far as

15  I could tell, it looked like it was ready to fire.

16      MR. FITZPATRICK:  Okay.  Move to strike.  Lacks foundation.

17      THE COURT:  You want to lay a foundation?

18      MR. WOODS:  Q.  Sir, you told us you've been an officer for

19  over eight years?

20  A.  About almost eight years.

21  Q.  Have you had experience with firearms?

22  A.  Yes.

23  Q.  Have you had experience with rifles?

24  A.  Yes.

25  Q.  Can you tell us about your experience with handguns and

26  rifles?

27  A.  Well, when a round is in the chamber, the bolt is slid

28  forward on the rifle, I would be very careful where I was

33

1  pointing that weapon because, from my experience, that weapon is

2  ready to fire.

3  Q.  You ever gone hunting?

4  A.  Yes.

5  Q.  As part of your investigation in this case, were photographs

6  taken of the rifle that we've been talking about?

7  A.  Yes.

8  Q.  Do you have a black and white photocopy possibly?

9                          (People's Exhibit No. 1 marked for

10                         identification.)

11     THE COURT:  What caliber was it?

12     THE WITNESS:  From memory, I think it was a 7.62 by 54R, and

13  that information was given to me by Mr. Green.

14     THE COURT:  The People's 1 is the photograph?

15     MR. WOODS:  It's an 8-by-11 piece of paper with three smaller

16  black and white photographs attached to it.  I've shown it to

17  defense counsel, and the clerk has marked it as People's No. 1

18  for identification.

19  Q.  Officer, showing you People's No. 1 for identification, the

20  8-by-11 piece of paper with three smaller black and white

21  photographs.  Do you recognize that?

22  A.  Yes.

23  Q.  In the top left-hand corner, what does that show?

24  A.  That shows the rifle that we took from 1 Santa Barbara.

25  Q.  The bottom right hand corner, what does that show?

26  A.  The same rifle.

27  Q.  And the bottom left-hand corner, what does that photograph

28  show?

34

1  A.  That is a tackle box filled with ammunition of various

2  calibers that was also in Mr. Green's apartment.

3  Q.  In the apartment or in the garage?

4  A.  This was in the apartment.

5  MR. WOODS:  Your Honor, could People's 1 be moved into

6  evidence?

7  THE COURT:  Subject to cross, sure.  Since there is a motion

8  to suppress, I thought I'd hear it all.

9  MR. WOODS:  Thank you.  Officer, I have no further questions

10  at this time.

11  THE COURT:  Mr. Fitzpatrick.

12  MR. FITZPATRICK:  Thank you.

13                    CROSS-EXAMINATION

14  MR. FITZPATRICK:  Q.  Good morning, Officer.

15  A.  Good morning.

16  Q.  On the day that you went, do you recall what day it was?

17  THE COURT:  You mean the actual date or the day of the week?

18  MR. FITZPATRICK:  Q.  The actual date, please.

19  A.  After looking in my report, I'm sure that it was July 28th.

20  Q.  Okay.  And what time during the day was it?

21  A.  I believe it was in the afternoon.

22  Q.  Okay.  Would it refresh your recollection to review your

23  report?

24  A.  Sure.

25  Q.  Okay.

26  A.  Thank you.

27  Q.  Does that refresh your recollection?

28  A.  Yes.

35

1   Q.   Do you recall what time it was that you went there?

2   A.   As I recall, it was sometime after 2:00.  I remember thinking

3   it was late in my day, and I was going to have to stay a little

4   later.

5   Q.   And you were in uniform; is that right?

6   A.   Yes, sir.

7   Q.   And your partner was in uniform?

8   A.   Yes.

9   Q.   And you were in a marked patrol vehicle?

10  A.   Yes.

11  Q.   And you went to the house; is that right?

12  A.   Yes.

13  Q.   And you looked for Mr. Green in the lower unit first?

14  A.   Yes.

15  Q.   And how did you do that?  Did you knock on the door?  Did you

16  yell out to whoever?

17  A.   We did knock on the door.  I can't recall if I called out his

18  name.

19  Q.   When you knocked on the door, did you announce yourself as

20  the police?

21  A.   Yes.

22  Q.   And did you say something, I don't know what

23  characteristically you might say, but something to the effect of

24  "San Francisco Police.  Open up"?

25  A.   I don't recall the exact words I used.  Something to that

26  effect.

27  Q.   Okay.  The purpose of that would be to try to get whoever, if

28  somebody was inside, to know it was the police and that you

36

1  wanted access or you wanted to talk to them; is that right?

2  A.  Yes.

3  Q.  And you were looking specifically for Mr. Green?

4  A.  Mr. Green...I don't remember if there was a name given, but

5  from prior response to that address, I suspected it was Mr.

6  Green.

7  Q.  And you actually located -- or you directed your

8  investigation to where you knew him to live, correct?

9  A.  Yes.

10  Q.  And so you knew his name and where he lived, and you were

11  looking for him, correct?

12  A.  Yes.

13  Q.  And you weren't looking for anybody else at that point, just

14  him?

15  A.  No.  That's not correct.

16  Q.  Okay.  As a suspect or, you know, as a party to this dispute,

17  who else were you looking for?

18  A.  Well, I responded to this address looking for a person with a

19  gun.  I try to keep an open mind.  If I was just looking for Mr.

20  Green and somebody else had the gun and I wasn't looking for him,

21  then I could put myself in jeopardy.

22  Q.  Okay.  Well, actually, then there was no call that there was

23  a person with a gun.  You were informed by dispatch that there

24  might be weapons at the property, correct?

25  A.  I don't believe that's true.  I'd have to refresh the CAD.

26  Q.  Would you like to?

27  A.  Sure.

28      MR. FITZPATRICK:  May I have this marked as defense next in

37

1    order.   I believe it is D.

2        THE COURT:   It is D.

3                                (Defendant's Exhibit D marked for

4                                identification.)

5        MR. FITZPATRICK:   May I approach?

6        THE COURT:   Yes.

7        MR. FITZPATRICK:   Q.   Directing your attention to the entry

8    that's next to the time of 14:12:19, please.   It's the first

9    entry.

10   A.   I'm not sure what your question is about this now.

11       THE COURT:   What were you told about a gun?

12       MR. FITZPATRICK:   Q.   More specifically, you weren't told

13   that there was a person with a gun.   It was that there may

14   possibly be weapons at the property, correct?

15   A.   Well, according to the typing, yes, you could interpret it

16   that way.   The way I interpret that is that there's person with a

17   rifle there.   It might have been that it was broadcast and not

18   entered into the CAD.

19   Q.   Okay.   Well, let's be clear.   According to the typing of the

20   CAD, dispatch person, they typed that there was a suspect Ron

21   Green, correct?

22   A.   You're reading it verbatim.   I'd say yes.

23   Q.   This is what you heard them tell you, correct?

24   A.   Yes.

25   Q.   And the caller was Ramon, correct?

26   A.   I'm not looking at it.

27   Q.   Would it refresh your recollection too because if it would,

28   I'd be happy to give it back to you?

38

1    A.   Sure.  I can read it if you like.  I'll agree with what you

2    say.

3        MR. WOODS:  Judge, I'll agree to moving it into evidence.

4    The officer can read it himself.

5        MR. FITZPATRICK:  I was just trying to contextualize it for

6    him.  Okay.

7        THE COURT:  Okay.

8        MR. FITZPATRICK:  Q.  So the reporting party is Ramon,

9    correct?

10   A.   Yes.

11   Q.   And it states that the subject, who would be Mr. Green,

12   correct?

13   A.   Yes.

14   Q.   May POSS have firearms at premise.  "POSS," as far as CAD

15   lingo, is "possibly," correct?

16   A.   Yes.

17   Q.   It means nothing else.  That's what you were trained at the

18   Academy, correct?

19   A.   I don't think we were trained on that word, but I'll agree

20   with you.

21   Q.   You weren't trained on abbreviations of the CAD system?

22   A.   I think that's kind of -- I don't want to argue with you.  I

23   think I see where you're going with this, and I think I'm

24   inclined to agree with you regarding that.

25   Q.   Specifically, though, weren't you trained that when you're

26   like reading, because what you have in the computer -- you have

27   an on-board computer, don't you?

28   A.   Yes.

1  Q.  And Communications will type in information, and it will be

2  on your computer screen, right?

3  A.  Yes.

4  Q.  What we're looking at on this paper that's been marked as

5  defense D is what would actually have been on your computer

6  screen, correct?

7  A.  Yes.

8  Q.  There is actually a list of abbreviations that you're trained

9  that the Police Department's dispatch will use.  Aren't you

10  trained in that?

11  A.  I don't recall that.

12  Q.  Okay.  So you don't recall ever being trained that "POSS"

13  always is meant to mean by CAD "possibly"?

14  A.  Yeah, I don't recall that.

15  Q.  But in your practice, it's your interpretation that that's

16  how it's always used?

17  A.  Yes.

18  Q.  So they did say that subject may possibly have firearms at

19  premise, possibly a long rifle, correct?

20  A.  Yes.

21  Q.  So there wasn't a -- the whole point I'm just making is there

22  wasn't a statement that, in fact, it's confirmed that there was a

23  weapon and it was a long rifle, correct?

24  A.  I would agree that it was not confirmed.

25  Q.  Okay.  Down further in the CAD, as a matter of fact, the

26  reporting party who again would be Ramon states that the suspect

27  is a handyman and somehow worked his way into the reporting

28  party's house, and he's now occupying the premise and will not

40

1   let reporting party into his house.  Do you recall that being --

2   A.  That sounds familiar.

3   Q.  But nowhere did it ever say that there was a gun being pulled

4   on the reporting party or anything of that nature, correct?

5   A.  I believe that's true.

6   Q.  Okay.  But you did know when you got to the premise that you

7   were looking for Ronald Green and he was the suspect to the call,

8   correct?

9   A.  As I stated earlier, yes.

10   Q.  And that's why you went down to his unit?

11   A.  It seemed logical to me, yes.

12   Q.  And announced yourselves as police officers?

13   A.  Yes.

14   Q.  And then said something to the effect, but you don't recall

15   verbatim, "San Francisco Police.  Mr. Green, we want to talk to

16   you.  We need you to open the door and step outside" or

17   something, correct?

18      MR. WOODS:  Objection.  Assumes facts not in evidence.

19      THE COURT:  Something like that.  I think we got that far,

20   right, Officer?

21      THE WITNESS:  Yes.  I identified myself as a police officer,

22   and I did knock on his door.

23      MR. FITZPATRICK:  Q.  And the purpose was to get him to

24   either open the door or talk to you, correct?

25   A.  Yes.

26   Q.  So he came out and was eminently cooperative; is that right?

27   A.  Yes.

28      THE COURT:  He came from upstairs?

41

1    MR. FITZPATRICK:  Yes.

2    Q.  And he was out of that premise at the time that you wanted to

3    allay your concerns about a weapon; is that right?

4    A.  Yes.

5    Q.  And there was two officers there with him, yourself and your

6    partner Officer Adamson?

7    A.  Yes.

8    Q.  And did you ask him to sign a consent to search form?

9    A.  No.

10   Q.  Did you ask him to write out a written consent to search?

11   A.  No.

12   Q.  Did you ask to tape record his consent to search?

13   A.  No.

14   Q.  And, nonetheless, you claim that he told you that there --

15   that you asked him -- you were asking him questions about a

16   weapon and you thought he was a suspect, correct?

17   A.  I was open-minded at that time, but I did ask him questions.

18   He was the first person that I came in contact with there, so

19   yes.

20   Q.  Sure.  As a matter of fact, you had been instructed via

21   dispatch and your mobile -- I believe they call it Mobile Vehicle

22   Technology, the MVT unit, that he was a suspect, correct?

23       THE COURT:  We have in the record what he was told.

24       MR. FITZPATRICK:  Q.  Okay.  So when you went up and started

25   questioning him, did you Mirandize him?

26   A.  No.

27   Q.  Nonetheless, he responded and cooperated and directed your

28   attention to a location inside the unit where you went and found

42

1   a weapon, correct?

2   A.   Yes.

3   Q.   And he didn't try to go back in the house with you or

4   anything like that.  He stayed where you told him to with your

5   partner?

6   A.   I don't recall exactly if he initially tried to go back in

7   the house.  I recall Mr. Green as being cooperative and helpful,

8   and I want to say that he offered to show me where it was, but

9   no, he didn't come in the house with me.  That didn't seem to be

10  an issue.

11  Q.   He was respecting your authority on the scene.  Is that fair

12  to say?

13  A.   Absolutely.

14  Q.   Okay.  And so you retrieved the rifle that was in the garage,

15  and then did you take the rifle out and put it in your cruiser,

16  like disarm it, and I think you guys have a terminology you use

17  to get it secured and out of everybody's harm's way; is that fair

18  to say?

19  A.   I took custody of the weapon for the meantime, and I unloaded

20  it, and I put it in the trunk of the car.

21  Q.   So it was out of harm's way?

22  A.   Yes.

23  Q.   And then you went into his unit itself and searched his unit?

24  A.   Not immediately.

25  Q.   Okay.  How soon after you have put the rifle in the trunk of

26  the patrol car?

27  A.   I'm not sure of the exact time.  I don't recall the exact

28  time.  Lt. Oberhoffer spoke with Mr. Green for a while, and after

1  that, that's when we went into the unit to look for other

2  weapons.

3  Q.  To look for other weapons?

4  A.  Yeah.

5  Q.  Did he tell you he had other weapons in there?

6  A.  I don't recall what he said about other weapons at that time.

7  Q.  Did he give you a -- did he sign a consent to search for the

8  search of his apartment?

9  A.  No.

10  Q.  Did you take a written statement?

11  A.  No.

12  Q.  Did you tape record his consent?

13  A.  No.

14  Q.  But, nonetheless, you searched it, and you found some

15  ammunition in a toolbox or a tool -- fishing kit?

16      THE COURT:  Tackle box.

17      MR. FITZPATRICK:  Q.  Tackle box.  Thank you.  Is that what

18  happened?

19  A.  Yes.

20  Q.  And Mr. Green had told you officers on the scene that he had

21  done nothing wrong that day and that's why he was cooperative.

22  Isn't that fair to say?

23  A.  He didn't tell us he hadn't done anything wrong that day.

24  Q.  Would it refresh your recollection to review a copy of your

25  police report?

26  A.  If you'd like me to, sure.

27      THE COURT:  He's got one in front of him.  Why don't you

28  direct him to which page.

44

1    MR. FITZPATRICK:  Q.  Page 5 of 6, last paragraph.  Starting

2    with the sentence, "Green told Lt. Oberhoffer that he wanted to

3    cooperate, that he hadn't done anything wrong and granted us

4    permission to look through his lower level apartment."

5    A.  Yes.  Sounds true.

6    Q.  That was the state of affairs that day?

7    A.  Yes.

8        MR. FITZPATRICK:  Thank you, Your Honor.  If I could just

9    have one moment?

10       THE COURT:  Okay.

11       MR. FITZPATRICK:  Thank you.  Nothing further, Officer.

12       MR. WOODS:  Move People's 1 in.

13       THE COURT:  You finished with the witness?

14       MR. FITZPATRICK:  Yes.

15       THE COURT:  Thank you, Officer.  Any objection?

16       MR. FITZPATRICK:  No, Your Honor.

17       THE COURT:  People's 1 in evidence is.

18                                   (People's Exhibit No. 1 was

19                                   received into evidence.)

20       MR. FITZPATRICK:  Okay.

21       THE COURT:  Do you want any of your stuff in?

22       MR. FITZPATRICK:  Did you want to look at the CAD?

23       THE COURT:  No, I think everybody read it to me.

24       MR. FITZPATRICK:  No.  And the other things were the

25    ownership he agreed to, the written statement.

26       THE COURT:  Mr. Bunag's written statement, the title company

27    report, the CAD.  That was B.

28       MR. FITZPATRICK:  It was C.

45

1      THE COURT:  C, I have that as the witness's statement.  Were

2  there two of them?

3      MR. WOODS:  It's the inspector's chron, Your Honor.

4      THE COURT:  The witness's statement on the chron?

5      MR. WOODS:  Correct.

6      MR. FITZPATRICK:  Correct.

7      THE COURT:  Do you want any of those in?

8      MR. FITZPATRICK:  No.  Thank you.

9      THE COURT:  All defense exhibits are withdrawn.

10     MR. FITZPATRICK:  Thank you.

11     THE COURT:  Submitted?

12     MR. WOODS:  Yes.

13     THE COURT:  Mr. Fitzpatrick?

14     MR. FITZPATRICK:  Thank you.  Your Honor, at this time, I

15  would ask the Court to reduce this matter pursuant to Penal Code

16  Section 17(b).  Well, first, I would ask that you make no holding

17  on the 245(a)(1) given that there's no --

18     THE COURT:  It's an (a)(2).

19     MR. FITZPATRICK:  No, I'm not asking to make a holding on

20  that one.  And then I'll ask you to reduce the other remaining.

21     The witness did not say to 911 that my client, in fact, held

22  a gun on him.  At the time, according to his own testimony, that

23  was when he would have been terrified, thought it was an

24  attempted murder.  You know, he described in really graphic terms

25  of how he sped away from the house, he was terrified, he was

26  scared, he was afraid.  Then when 911 is talking to him, they're

27  like, well, what's happening?  He may have weapons.  He's taken

28  over the house by force.  But I saw him like a month and a half

46

1    ago or two months, whatever he said, with a weapon.  If, in fact,

2    my client had taken a weapon and brandished it or pointed it at

3    him, less than immediately preceding that call, that would have

4    been the first thing out of his mouth.

5        So based on that, I would ask the Court not to make a holding

6    and then reduce the remainder of the complaint to misdemeanors.

7        MR. WOODS:  Judge, I'll submit it.

8        THE COURT:  Let me see counsel.

9        (Off-record discussion at the bench.)

10       THE COURT:  Submitted, everybody?

11       MR. FITZPATRICK:  Submitted, Your Honor.

12       MR. WOODS:  Yes.

13       THE COURT:  Mr. Green, I find the offenses alleged in Counts

14   1 and 3 of the complaint have been committed and there's

15   sufficient cause to believe that you are guilty thereof.  I,

16   therefore, think you should be held to answer in Department 22 on

17   the 26th of August.  The misdemeanor in Count 3 is certified.

18       MR. FITZPATRICK:  Your Honor, at this time, then I would ask

19   that Mr. --

20       MR. WOODS:  Your Honor, I think you inverted it.

21       THE COURT:  Oh, I'm doing it off the calendar, not the

22   complaint.  The calendar, I have one and three are felonies and

23   two is a misdemeanor.

24       MR. WOODS:  One and two are the felonies, and three is the

25   ~~municipal complaint.~~

26       THE COURT:  Thank you.  Holding on Count 1 and 2, and Count 3

27   is certified.

28       MR. FITZPATRICK:  Your Honor, at this time, I would ask that

47

1    Mr. Green be released on his own recognizance, given the Court's

2    heard the case, with the appropriate stay away orders.  There are

3    no weapons in his possession.  They've been confiscated.  And the

4    appropriate order would be to, of course, not have any weapons

5    during the pendency of his release.

6        I think it's unfair to keep him in custody based on the state

7    of this evidence while this case gets tried.  He has no record so

8    to speak of.  I think there's like a minor 10851 from '98, but I

9    could try and grab the rap sheet in front of me.

10       I think what this case is, Judge, it's a landlord-tenant

11   dispute, and now the criminal justice system has gotten involved

12   in it.  And I don't think it's fair to keep somebody in custody

13   while that gets resolved.

14       THE COURT:  I've had sufficient evidence on the gun.  The gun

15   had something to do with this.  The request for release is

16   denied.

17       (Whereupon, the Court called unrelated calendar matters.)

18       MR. WOODS:  Before we go off the record, can we recall the

19   Ronald Green matter?

20       THE COURT:  Yes.

21       MR. WOODS:  While we were going through that, I didn't hear

22   the Court make a ruling on the MTR.

23       THE COURT:  I didn't express one.  You're correct.  That

24   motion to suppress is denied.

25       MR. FITZPATRICK:  And the basis of it, Your Honor?

26       THE COURT:  The basis for the denial is everything they did

27   was fine.

28       MR. FITZPATRICK:  I don't agree with that.

48

1          (Whereupon, the proceedings were adjourned.)

2                          ---oOo---

1  STATE OF CALIFORNIA      )
                            )  SS.
2  COUNTY OF SAN FRANCISCO  )

3

4      I, Rhonda Fung, Certified Court Reporter of the Superior

5  Court of California, hereby certify that the foregoing is a true

6  and correct transcription of the testimony and proceedings had in

7  the above-entitled matter, and that the same is a true and

8  correct transcription of the shorthand notes as taken by me in

9  said matter.

10

11  DATED: 8/22/08

12

13

14

15                              *Rhonda Fung*
16                              _____
                                RHONDA FUNG, CSR #4819

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT E

TO DECLARATION OF
DONALD P. MARGOLIS

1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   JOANNE HOEPER, State Bar #114961
    Chief Trial Deputy
3   DONALD P. MARGOLIS, State Bar #116588
    Deputy City Attorney
4   Fox Plaza
    1390 Market Street, Sixth Floor
5   San Francisco, California 94102-5408
    Telephone:    (415) 554-3853
6   Facsimile:    (415) 554-3837
    E-Mail:       don.margolis@sfgov.org
7

8   Attorneys for Defendants
    CITY AND COUNTY OF SAN FRANCISCO,
9   THOMAS ABRAHAMSEN, LORENZO ADAMSON,
    DAVID OBERHOFFER, JERRY KING, and
10  MICHAEL WILLIAMS

11

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15  RONALD GREEN,                          Case No. C 07-3433 MMC

16          Plaintiff,                     **DEFENDANT CITY AND COUNTY OF**
                                           **SAN FRANCISCO'S FIRST SET OF**
17      vs.                                **INTERROGATORIES TO PLAINTIFF**
                                           **RONALD GREEN**
18  CITY AND COUNTY OF SAN
    FRANCISCO, THOMAS ABRAHAMSEN,
19  LORENZO ADAMSON, DAVID
    OBERHOFFER, JERRY KING, MICHAEL
20  WILLIAMS, RAMON BUNAG, ESTHER
    GRAZIZO and Does 1-50, inclusive,
21
            Defendants.
22

23  PROPOUNDING PARTY:    Defendant CITY AND COUNTY OF SAN FRANCISCO

24  RESPONDING PARTY:     Plaintiff RONALD GREEN

25  SET NUMBER:           ONE

26          Pursuant to Fed.R.Civ.P. 33(a), defendant City and County of San Francisco (the "City")

27  hereby serves you with written interrogatories set forth below.

28

SPECIAL INTERROGATORIES; CASE NO. C 07-3433          1                    n:\lit\li2007\080465\00444188.doc

                                                                          *App 4-2*

Case 3:07-cv-03433-MMC    Document 45-3    Filed 09/05/2008    Page 55 of 63

1    **INSTRUCTIONS**

2    Pursuant to Fed.R.Civ.P. 33(b)(3), your written responses to the interrogatories are due within

3    30 days after service of the interrogatories.

4    Please be advised that Civil Local Rule 33-1(a) provides as follows:

5    "Answers and objections to interrogatories shall set forth each question in full
     before each answer or objection. Each objection shall be followed by a
6    statement of reason for the objection. When objection is made to part of an
     interrogatory, the remainder of the interrogatory shall be answered at the time
7    the objection is made, or within the period of any extension of time to respond,
     whichever is later."

8

9    These interrogatories are continuing and the City requests that any information responsive to

10   them be produced when obtained by the Responding Party. At the trial in this case, the City shall

11   move the Court to prevent you from using as evidence any information that was responsive to these

12   interrogatories but not disclosed.

13   **DEFINITIONS**

14   1.    **"IDENTIFY"** means provide the name and last known address, telephone number

15   and relationship to you, whether as a relative, friend, acquaintance, fellow employee, or total stranger.

16   2.    **"THE INCIDENT"** means the series of incidents beginning on or about July 1, 2005,

17   that forms the basis, at least in part, for this action.

18   3.    **"THE COMPLAINT"** means the Complaint for Damages filed in this action on or

19   about June 29, 2007.

20   4.    **"YOU"** means plaintiff Ronald Green and any person acting on his behalf.

21   **INTERROGATORIES**

22   **INTERROGATORY NO. 1:**

23   Please state all facts that support **YOUR** allegation in paragraph 24 of **THE COMPLAINT**

24   that the officers who came to your home on or about July 28, 2005 knew or reasonably should have

25   known that **YOUR** agreement as a tenant allowed **YOU** access to the upstairs unit for the purpose of

26   using the kitchen.

27

28

SPECIAL INTERROGATORIES; CASE NO. C 07-3433        2        n:\lit\li2007\080465\00444188.doc

**INTERROGATORY NO. 2:**

Please state all facts that support **YOUR** allegation in paragraph 24 of **THE COMPLAINT** that the officers who came to your home on or about July 28, 2005 knew or reasonably should have known that defendant Bunag had previously attempted to evict **YOU** from your rental unit.

**INTERROGATORY NO. 3:**

Please state all facts that support **YOUR** allegation in paragraph 24 of **THE COMPLAINT** that the officers who came to your home on or about July 28, 2005 knew or reasonably should have known that defendant Bunag had a grudge against **YOU**.

**INTERROGATORY NO. 4:**

Please state all facts that support **YOUR** allegation in paragraph 24 of **THE COMPLAINT** that the officers who came to your home on or about July 28, 2005 knew or reasonably should have known that defendant Bunag had a dispute with **YOU** about **YOUR** rental of the house.

**INTERROGATORY NO. 5:**

Please state all facts that support **YOUR** allegation in paragraph 24 of **THE COMPLAINT** that the officers who came to your home on or about July 28, 2005 knew or reasonably should have known that defendants Bunag and Granizo were using the officers in his, her, or their effort to remove **YOU** from the premises.

**INTERROGATORY NO. 6:**

Please state all facts that support **YOUR** allegation in paragraph 27 of **THE COMPLAINT** that any defendant police officer caused **YOU** to be involuntarily placed in the San Francisco General Hospital Psychiatric Ward.

**INTERROGATORY NO. 7:**

Please state all facts that support **YOUR** allegation in paragraph 28 of **THE COMPLAINT** that any defendant police officer submitted a police report containing false statements **OR** material omissions.

**INTERROGATORY NO. 8:**

For every individual that you name as a defendant in this action, please describe, in detail, what **YOU** allege that individual did to cause **YOU** injury or damage.

1 | **INTERROGATORY NO. 9:**

2 |      Please **IDENTIFY** each and every health care provider, including mental health care

3 | providers, who provided **YOU** with health care for the injuries that you attribute to **THE**

4 | **INCIDENT.**

5 | **INTERROGATORY NO. 10:**

6 |      Please **IDENTIFY** each and every facility in or from which **YOU** received health care,

7 | including mental health care, for the 10 years before **THE INCIDENT.**

8 | **INTERROGATORY NO. 11:**

9 |      Please **IDENTIFY** each individual who provided **YOU** with health care for the 10 years

10 | before **THE INCIDENT.**

11 | **INTERROGATORY NO. 12:**

12 |      Please **IDENTIFY** every employer that **YOU** have had for the last 10 years.

13 |

14 | Dated:  March 3, 2008

15 |                                   DENNIS J. HERRERA
                                   City Attorney

16 |                                   JOANNE HOEPER
                                   Chief Trial Deputy

17 |                                   DONALD P. MARGOLIS
                                   Deputy City Attorney

18 |

19 |                          By:

20 |                                   DONALD P. MARGOLIS
                                   Attorneys for Defendant

21 |                                   CITY AND COUNTY OF SAN FRANCISCO

22 |

23 |

24 |

25 |

26 |

27 |

28 |

PROOF OF SERVICE

I, ANITA MURDOCK, declare as follows:

I am a citizen of the United States, over the age of eighteen years and not a party to the above-entitled action.  I am employed at the City Attorney's Office of San Francisco, Fox Plaza Building, 1390 Market Street, Sixth Floor, San Francisco, CA 94102.

On March 3, 2008, I served the following document(s):

**DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S FIRST SET OF INTERROGATORIES TO PLAINTIFF**

on the following persons at the locations specified:

Kenneth N. Frucht, Esq.
Law Offices of Kenneth N. Frucht
120 Montgomery Street, Suite 1600
San Francisco, CA  94104
Tel:  415-392-4844
Fax:  415-392-7973
*Attorney for Plaintiff*

in the manner indicated below:

☐    **BY UNITED STATES MAIL**:  Following ordinary business practices, I sealed true and correct copies of the above documents in addressed envelope(s) and placed them at my workplace for collection and mailing with the United States Postal Service.  I am readily familiar with the practices of the San Francisco City Attorney's Office for collecting and processing mail.  In the ordinary course of business, the sealed envelope(s) that I placed for collection would be deposited, postage prepaid, with the United States Postal Service that same day.

☒    **BY PERSONAL SERVICE**:  I sealed true  and correct copies of the above documents in addressed envelope(s) and caused such envelope(s) to be delivered by hand at the above locations by a professional messenger service.  **A declaration from the messenger who made the delivery ☐ is attached or ☐ will be filed separately with the court.**

☐    **BY OVERNIGHT DELIVERY**:  I sealed true and correct copies of the above documents in addressed envelope(s) and placed them at my workplace for collection and delivery by overnight courier service.  I am readily familiar with the practices of the San Francisco City Attorney's Office for sending overnight deliveries.  In the ordinary course of business, the sealed envelope(s) that I placed for collection would be collected by a courier the same day.

☐    **BY FACSIMILE**:  Based on a written agreement of the parties to accept service by fax, I transmitted true and correct copies of the above document(s) via a facsimile machine at telephone number Fax #' to the persons and the fax numbers listed above.  The fax transmission was reported as complete and without error.  The transmission report was properly issued by the transmitting facsimile machine, and **a copy of the transmission report ☐ is attached or ☐ will be filed separately with the court.**

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Executed March 3, 2008, at San Francisco, California.

*Anita Murdock*
ANITA MURDOCK

EXHIBIT F

TO DECLARATION OF
DONALD P. MARGOLIS

Kenneth N. Frucht, State Bar No. 178881
LAW OFFICES OF KENNETH FRUCHT
120 Montgomery Street, Suite 1600
San Francisco, CA 94104
Tel: (415) 392-4844
Fax: (415) 392-7973

ATTORNEY FOR PLAINTIFFS

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD GREEN, | ) CASE NO.: C 07-3433 MMC |
| Plaintiff, | ) |
| v. | ) |
| CITY AND COUNTY OF SAN FRANCISCO, THOMAS ABRAHAMSEN, LORENZO ADAMSON, DAVID OBERHOFFER, JERRY KING, MICHAEL WILLIAMS, RAMON BUNAG, ESTHER GRANIZO, and DOES 1-50, inclusive, | ) PLAINTIFF'S RESPONSE TO SPECIAL ) INTERROGATORIES, SET ONE ) ) ) ) ) |
| Defendants. | ) |

PROPOUNDING PARTY: DEFENDANT CITY AND COUNTY OF SAN FRANCISCO

RESPONDING PARTY:    PLAINTIFF RONALD GREEN

SET NO:                           ONE

Comes now Ronald Greet ("GREEN" or "Plaintiff") and responds to the Special

Interrogatories, Set One, propounded by Defendant City and County of San Francisco, as follows:

## GENERAL OBJECTIONS

These responses and objections are made solely for the purpose of this action.

The following responses are based upon information presently available to Plaintiff. Discovery in

this matter is still ongoing and Plaintiff reserves the right to introduce or rely upon subsequently

discovered information in the course of this litigation.

Except for explicit facts admitted herein, no incidental or implied admissions are intended

thereby. The fact that Plaintiff has answered or objected to any request or part thereof should not be

-1-

1    taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed

2    by such requests or that such answer or objection constitutes admissible evidence. The fact that

3    Plaintiff has answered part or all of any request is not intended and shall not be construed to

4    constitute a waiver by Plaintiff of all or any part of any objection to any request. Nothing contained

5    herein shall be construed as an admission relevant to the existence or non-existence of any fact. No

6    implied admissions whatsoever are intended by this response.

7         To the extent that any or all of the requests call for information which constitutes information

8    or material prepared in anticipation of litigation or for trial or for information or material covered by

9    the work product doctrine or which constitutes information which is privileged by virtue of the

10   attorney-client privilege, work product privilege, or any other privilege, Plaintiff objects to each and

11   every such request, and/or part thereof not answered, and thus will not supply or render any such

12   information or materials.

13        The above-stated objections are hereby made applicable to each and all of Plaintiff's

14   responses and answers and are hereby, as to each and all of them, incorporated by reference as if fully

15   set forth therein.

16   **RESPONSE TO SPECIAL INTERROGATORY NO. 1**

17   The residence located at 1 Santa Barbara is a single family home with only one kitchen. Officer

18   Abrahamsen had been to the house on at least one prior occasion and was aware of the ongoing

19   dispute between Green and his landlord related to his access to the upstairs kitchen. Further, San

20   Francisco ordinances require that units rented out have kitchen facilities, so the officers should have

21   known that any landlord tenant agreement would provide Green with access to the kitchen facilities.

22   **RESPONSE TO SPECIAL INTERROGATORY NO. 2**

23   Officer Abrahamsen had been to the house on at least one prior occasion and was aware of the

24   ongoing dispute between Green and his landlord related to his access to the upstairs kitchen, and

25   they were also informed by Green that Bunag had previously attempted to evict him. Further,

26   Green overheard the officers speaking about Bunag's attempted eviction.

27   **RESPONSE TO SPECIAL INTERROGATORY NO. 3**

28   The officers knew that Bunag was attempting to evict Plaintiff. It would be reasonable to assume

-2-

that a landlord attempting unsuccessfully to evict a tenant would hold a grudge against the tenant. Moreover, Plaintiff had made prior calls to the SFPD regarding harassment perpetrated by Bunag, and the SFPD officers had access to prior information relating to these calls.

**RESPONSE TO SPECIAL INTERROGATORY NO. 4**

The officers knew that Bunag was attempting to evict Plaintiff. It would be reasonable to assume that a landlord attempting unsuccessfully to evict a tenant would hold a grudge against the tenant. Moreover, Plaintiff had made prior calls to the SFPD regarding harassment perpetrated by Bunag, and the SFPD officers had access to prior information relating to these calls.

**RESPONSE TO SPECIAL INTERROGATORY NO. 5**

Prior to July 28, 2005 at least one of the officers (Lorenzo Adamson) had confronted Plaintiff and asked whether he had paid his rent, in essence allowing a SFPD officer to be used as a rent collector.

**RESPONSE TO SPECIAL INTERROGATORY NO. 6**

The officers made false statements on the police report – that Plaintiff appeared "paranoid and delusional." Green never made the statements attributed to him by the officers. Instead, Plaintiff was pleasant and cooperative with the officers.

**RESPONSE TO SPECIAL INTERROGATORY NO. 7**

There was no 'incident' prior to the arrival of the officers, and the report contains material omissions and misstatements of fact. Defendants fabricated, and Plaintiff did not make the statements attributed to him in the police report.

**RESPONSE TO SPECIAL INTERROGATORY NO. 8**

Each of the officers acted in concert to falsely arrest Plaintiff and ultimately to effectuate the eviction of Plaintiff from his residence. The officers also acted in concert to wrongfully confiscate Plaintiff's gun collection and ammunition.

**RESPONSE TO SPECIAL INTERROGATORY NO. 9**

N/A

**RESPONSE TO SPECIAL INTERROGATORY NO. 10**

N/A

PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORIES, SET ONE

1  **RESPONSE TO SPECIAL INTERROGATORY NO. 11**

2  Plaintiff does not have any records or have any recollection at this time of the information required

3  to respond to this request.

4  **RESPONSE TO SPECIAL INTERROGATORY NO. 12**

5  Town Limousine

6  Davel Limousing

7  Avalon Limousine

8  ABC Limousine

9  Music Express Limousine

10  True Stone, Inc.

11  Jajic Plumbing, Inc.

12  Ledda Plumbing, Inc.

13  Discount Plumbing, Inc.

14  Putnam Toyota, Inc.

15  Discount Brake & Clutch, Inc.

16  Serramonte Dodge, Inc.

17  BMW & Ducate of Marin

18  BMW of San Francisco

19

20

21  Dated: April 15, 2008                    LAW OFFICES OF KENNETH FRUCHT

22

23

24                                          Kenneth N. Frucht
                                            Attorney for Plaintiff
25

26

27

28

PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORIES, SET ONE